STEPHEN P. ABDOW & others[1] vs. ATTORNEY GENERAL
& others.[2]

Suffolk. May 5, 2014. - June 24, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Initiative. Gaming. Pari Mutuel Wagering. Attorney General. Constitutional
Law,* Initiative petition, Taking of property, Police power. *Due Process of
Law,* Taking of property. *Elections,* Ballot, Validity of petition. *Contract,*
Implied. *License.*

This court concluded that the Attorney General erred in declining to certify
that an initiative petition meant to prohibit casino and slots gambling and
abolish parimutuel wagering on simulcast greyhound races meets the
requirements set forth in art. 48, The Initiative, II, § 3, as amended by art.
74, § 1, of the Amendments to the Massachusetts Constitution, where,
under the core police power, the Legislature and (through the initiative) the
voters of Massachusetts may choose to abolish such forms of gambling
and such wagering on such races, and doing so would not constitute a tak-
ing of property without compensation from those licensed to engage in
such operations [487-492]; where an applicant for a gaming license has no
implied contractual right to a final decision by the State gaming commis-
sion, and therefore, the initiative's prohibition of the approval of an ap-
plication for such a license would not constitute a taking that is inconsistent
with the right to receive compensation for private property appropriated to
public use [492-496]; where nothing in the initiative petition (which is
plainly a matter of Statewide concern), either expressly or by fair implica-
tion, restricts its operation to particular municipalities within the meaning
of the "local matters" exclusion of art. 48 [496-498]; and where the initia-
tive petition does not violate the so-called "related subjects" requirement
of art. 48, in that its provisions share a significant common purpose, are

[1]Stephanie C. Crimmins, Joseph A. Curtatone, Geri Eddins, Mark A. Gott-
lieb, Celeste B. Meyers, Kristian M. Mineau, Kathleen Conley Norbut, John
F. Ribeiro, and Susan C. Tucker.

[2]Secretary of the Commonwealth; and George Ducharme, Anita A. Bird,
Paul C. Picknelly, Frank Rossi, Joe Gentile, Jill McCarthy Payne, Ethel Grif-
fin, Dave Nault, Deb Nault, Thomas Hazzard, Susan Hazzard, Joseph Pacheco,
Patrick J. McCarthy, Lynn Percuoco, Tyler Crawford, Judith Ann Matt, Frank
A. Rossi, Michelle Jeffrey, William G. Lagorio, Louis Ciarlone, Daralyn Rear-
don, Debra Sablone, Dominic J. Sarno, Don Silverman, Daniel Rizzo, Robert
Taddia, Carol Kerr, Dawn Rogers, Michelle Barnaby, Deborah Little, Mario
Fiore, Ray Caporale, Nicole Griffin, Donna Mahoney, Gary Ferragamo, Lucy
Dello Russo, and Richard Covino, as interveners.

not so loosely tied together as to render the related subjects requirement meaningless, and are operationally related in a way that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy [498-504]; further, this court concluded that the Attorney General's summary of the measure proposed in the initiative petition was fair, where her understanding of the measure was reasonable and plainly consistent with what is intended by the initiative's proponents, and where there was no merit to claims that the summary was unfair on the grounds that the measure was ineffectual, that the summary was insufficiently detailed, or that the severability clause was inconsistent with art. 48's relatedness requirement [504-510].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 10, 2013.

The case was reported by *Spina*, J.

*Thomas O. Bean* (*H. Reed Witherby* with him) for the plaintiffs.

*Carl Valvo* for George Ducharme & others.

*Peter Sacks*, State Solicitor, for the defendants.

*Mary Katherine Geraghty, Timothy J. Fazio, & Jennifer L. Morse*, for Daniel Rizzo & others, were present but did not argue.

*Edward M. Pikula*, City Solicitor, & *Frank E. Antonucci*, for Dominic J. Sarno & others, were present but did not argue.

The following submitted briefs for amici curiae:

*Daniel O'Connell* for Massachusetts Competitive Partnership.

*Brian D. Tobin* for Massachusetts Council of Churches & others.

*Ellen Weiss Freyman & William J. Smith* for Affiliated Chambers of Commerce of Greater Springfield & another.

*Thomas R. Landry* for New England Regional Council of Carpenters.

*Jonathan M. Silverstein & Janelle M. Austin* for town of Plainville.

*Donald J. Siegel & Jasper Groner* for Massachusetts Building Trades Council.

*Melinda M. Phelps & Jennifer K. Cannon* for Greater Springfield Convention and Visitors Bureau, Inc.

*Edward L. Sweda, Jr.*, for Public Health Advocacy Institute.

*Nicole Micheroni* for Coalition of Citizens and Community Leaders.

*Brian T. Corrigan* for Stop Predatory Gambling.

GANTS, J. The issue presented on appeal is whether an initiative petition meant to prohibit casino and slots gambling and abolish parimutuel wagering on simulcast greyhound races meets the requirements set forth in art. 48 of the Amendments to the Massachusetts Constitution and, therefore, may be considered by voters at the November Statewide election. The Attorney General concluded that it did not and, accordingly, declined to certify it for inclusion on the ballot. The plaintiffs, ten Massachusetts voters who submitted the proposed initiative for certification, filed a complaint challenging the Attorney General's decision and sought an order requiring the Attorney General to certify the petition. We conclude that the Attorney General erred in declining to certify, and grant the requested relief so that the initiative may be decided by the voters at the November election.[3]

*Background.* 1. *The Expanded Gaming Act of 2011.* In November, 2011, the Legislature enacted the Expanded Gaming Act, St. 2011, c. 194 (act), that created the Gaming Commission (commission), and for the first time permitted casino and slots gambling in Massachusetts by those awarded gaming licenses by the commission. The act authorized the commission to award three licenses to qualified applicants to operate gambling casinos with table games and slot machines (category 1 or casino license), and another license to operate a gaming establishment with only slot machines (category 2 or slots parlor license).[4] G. L. c. 23K, §§ 2, 19, 20. The act also transferred the authority to license

[3]We acknowledge the amicus briefs submitted by Stop Predatory Gambling; Massachusetts Competitive Partnership; Public Health Advocacy Institute; Massachusetts Council of Churches, Episcopal Diocese of Western Massachusetts, Massachusetts Family Institute, Friends of Revere, Friends of East Boston, Rev. Nick Granitsas and Pastor Tim Bogertman of the First Congregational Church of Revere, Pastor Don Nanstad of Our Saviour's Lutheran Church, Dr. David Searles of the Central Assembly of God Church, Father Thomas Domurat, Father George Szal, and Deacon Francis McHugh; Massachusetts Building Trades Council; Greater Springfield Convention and Visitors Bureau, Inc.; Coalition of Citizens and Community Leaders; town of Plainville; Affiliated Chambers of Commerce of Greater Springfield and Massachusetts Convention Center Authority; and New England Regional Council of Carpenters.

[4]Under the Expanded Gaming Act, St. 2011, c. 194 (act), the Gaming Commission (commission) was authorized to grant casino licenses only within certain regions of Massachusetts, with only one license per region. The regions were region A, which included Suffolk, Middlesex, Essex, Norfolk,

and regulate the racing industry from the State Racing Commission to the commission. See St. 2011, c. 194, §§ 38, 40.

Pursuant to the act, the application process for casino and slots parlor licenses is in two phases. First, the commission determines whether the applicant is suitable for a license, based on various detailed criteria. See G. L. c. 23K, §§ 12, 15; 205 Code Mass. Regs. §§ 111.00, 114.00-117.00 (2013). Only those applicants found suitable in the first phase reach the second phase, where the commission considers the specific characteristics of the site proposed, based on other detailed criteria. See G. L. c. 23K, §§ 12 (*c*), 18; 205 Code Mass. Regs. §§ 118.00-119.00 (2014). Although the commission has the authority to issue three casino licenses and one slots parlor license, it is not obligated to issue any license. See G. L. c. 23K, § 19 (*a*) (commission may decide not to award any casino license where it is "not convinced" any applicant "has both met the eligibility criteria and provided convincing evidence that [it] will provide value to the region . . . and to the commonwealth"); G. L. c. 23K, § 20 (*a*) (same with respect to slots parlor license). An applicant who is denied a license by the commission has no entitlement to further review of the decision. G. L. c. 23K, § 17 (*g*) ("[C]ommission shall have full discretion as to whether to issue a license. Applicants shall have no legal right or privilege to a gaming license and shall not be entitled to any further review if denied by the commission").

To be eligible to receive a casino or slots parlor license, the applicant must pay an initial nonrefundable application fee of $400,000, and an additional amount "if the costs of the investigation exceed the initial application fee."[5] G. L. c. 23K, § 15 (11). If an applicant reaches phase two of the application process, the applicant may be required to pay further surcharges

and Worcester Counties; region B, which included Hampshire, Hampden, Franklin, and Berkshire Counties; and region C, which included Bristol, Plymouth, Nantucket, Dukes, and Barnstable Counties. G. L. c. 23K, § 19 (*a*). The slots parlor license was not limited by region. G. L. c. 23K, § 20. The act also authorized the Governor to enter into a compact with a federally recognized Native American tribe in the Commonwealth to operate a casino in region C. See St. 2011, c. 194, § 2A; G. L. c. 23K, §§ 4, 67.

[5]As of January 21, 2014, twelve applicants had paid the commission a total of at least $12.55 million in application fees and additional surcharges.

to cover the commission's additional cost of investigation.[6] 205 Code Mass. Regs. § 118.08 (2014).

An applicant who is awarded a license is required to pay a license fee of $85 million for a casino license and $25 million for a slots parlor license. See G. L. c. 23K, §§ 10 (*d*), 11 (*b*); 205 Code Mass. Regs. § 121.01 (2014). In addition, successful applicants are required to commit to a minimum capital investment of at least $500 million for a casino license and $125 million for a slots parlor license. See G. L. c. 23K, §§ 10 (*a*), 11 (*a*); 205 Code Mass. Regs. § 122.02 (2013). A casino license is valid for fifteen years, and a slots parlor license is valid for five years. See G. L. c. 23K, §§ 19 (*b*), 20 (*e*)-(*f*). But all licenses are subject to suspension or revocation on various grounds, as set forth in G. L. c. 23K, §§ 1 (9), 4 (15), 23 (*a*)-(*b*).

No category 1 license to operate a casino has been awarded by the commission. There are two applicants currently in phase two of the application process in region A. With respect to region B, the commission recently voted to award the license to MGM Springfield subject to "a finding by the Supreme Judicial Court invalidating the ballot initiative at issue in [this case] or . . . the rejection of the repeal petition in the November 6, 2014 general election." In region C, the Governor entered into, and the Legislature approved, a compact with the Mashpee Wampanoag Tribe (tribe) to operate a gaming establishment in Taunton that the tribe had the option, subject to several conditions, to acquire under an Intergovernmental Agreement. The application process of one applicant in region C is still in phase one, but those found suitable in phase one for regions A and B are not required to submit a new phase one application for region C.[7] In contrast, the commission decided in February, 2014, to award the category 2 license to an applicant to operate a slots parlor at the Plainridge harness racing track in Plainville,

---

[6]The three applicants who reached phase two in applying for the category 2 slots parlor license each paid an additional $500,000 to the commission to cover phase two costs.

[7]An applicant found conditionally suitable in phase one in pursuit of the region A license (but who was unable to secure the required voters' approval in the applicable "host community") is apparently now seeking the region C license.

and the applicant presumably paid the required $25 million licensing fee.[8]

2. *Initiative petition.* The act, apart from enacting G. L. c. 23K, which creates the commission and describes the application process to obtain casino and slots parlor licenses, also amended the definition of "[i]llegal gaming" in G. L. c. 4, § 7, Tenth. Before the act, "illegal gaming" was defined to "include every act punishable under any law relative to lotteries, policy lotteries or policy, the buying and selling of pools or registering of bets." G. L. c. 4, § 7, Tenth. The act redefined "illegal gaming" to mean:

> "a banking or percentage game played with cards, dice, tiles or dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks, credit or any representative of value, but excluding: (i) a lottery game conducted by the state lottery commission, under sections 24, 24A and 27 of chapter 10; (ii) a game conducted under chapter 23K; (iii) pari-mutuel wagering on horse races under chapters 128A and 128C and greyhound races under said chapter 128C; (iv) a game of bingo conducted under chapter 271; and (v) charitable gaming under said chapter 271."

G. L. c. 4, § 7, Tenth, as amended by St. 2011, c. 194, § 3. Among the consequences of the revised definition of "illegal gaming" was that "a game conducted under [c.] 23K," that is, gaming at casinos and slots parlors licensed by the commission, was excluded from the definition, as was parimutuel wagering on simulcast greyhound races under G. L. c. 128C.

The initiative petition seeks to ban casino and slots gambling that had been made legal under the act and to abolish parimutuel wagering on simulcast greyhound races. It attempts to accomplish this in two steps. First, it would amend yet again the definition of "illegal gaming" in G. L. c. 4, § 7, Tenth, by eliminating

[8]The commission intended to issue any casino gaming license in region A or B by April, 2014, and any casino license in region C by November, 2014. The former deadline was not met, however, and in light of this opinion and the commission's decision to postpone issuance of the category 1 license in region B until the results of the November 6, 2014, general election are known, it is doubtful that any casino license will be issued before then.

from the list of exclusions "a game conducted under [c.] 23K," and "pari-mutuel wagering on . . . greyhound races under [c.] 128C."[9] Second, it seeks to add a provision to c. 23K that would effectively nullify all the other provisions of c. 23K by prohibiting any "illegal gaming," as redefined in G. L. c. 4, § 7, Tenth, and by prohibiting the commission from accepting or approving any application to conduct "illegal gaming."[10]

Under art. 48, The Initiative, II, § 3, as amended by art. 74, § 1, of the Amendments to the Massachusetts Constitution, after ten qualified voters sign and submit an initiative petition, the petition is filed with the Secretary of the Commonwealth only if the Attorney General certifies that the petition is in proper form for submission to the voters, that it is not substantially the same as a petition submitted to the voters in either of the two preceding biennial state elections, and that "it contains only subjects not excluded from the popular initiative and which are related or which are mutually dependent." One of the subjects excluded from the popular initiative is a "proposition inconsistent with . . . [t]he right to receive compensation for private property appropriated to public use." Art. 48, The Initiative, II, § 2.

After reviewing the petition to determine if it complied with the requirements of art. 48, the Attorney General, in a letter dated September 4, 2013, declined to certify the petition. The Attorney General made clear that "applicants for gaming licenses will have no property rights in any licenses they may receive at the end of the application process," but she concluded that

---

[9]If the initiative petition were adopted, G. L. c. 4, § 7, Tenth, would provide as follows:

> "Tenth, 'Illegal gaming,' a banking or percentage game played with cards, dice, tiles or dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks, credit or any representative of value, but excluding: (i) a lottery game conducted by the state lottery commission, under sections 24, 24A and 27 of chapter 10; (ii) a~~game conducted under chapter 23K; (iii)~~ pari-mutuel wagering on horse races under chapters 128A and 128C ~~and greyhound races under said chapter 128C~~; ~~(iv)~~ [(iii)] a game of bingo conducted under chapter 271; and ~~(v)~~ [(iv)] charitable gaming under said chapter 271."

[10]The full text of the initiative petition, entitled "An Act Relative to Illegal Gaming," is set forth in the Appendix to this opinion.

G. L. c. 23K created an "implied contract[]" between the com-
mission and license applicants whereby those "who accepted
the [c]ommission's invitation to apply, and paid substantial ap-
plication and additional investigation fees, . . . have an implied
contractual right to *[c]ommission action on their applications* in
accordance with statutory and regulatory criteria" (emphasis in
original). In essence, she concluded that an applicant has an
implied contractual right to a decision by the commission regard-
ing its application for a license in accordance with G. L. c. 23K,
but not an implied contractual right to a license it may be awarded
by the commission under G. L. c. 23K. The Attorney General
determined that, because the proposed law would prohibit the
commission from approving any application for a license, it
would result in a "taking" without compensation of applicants'
implied contractual right to have the application process "play
out in accordance with G. L. c. 23K," and therefore could not
be the subject of an initiative petition under art. 48, The Initia-
tive, II, § 2, because it was inconsistent with the "right to
receive compensation for private property appropriated to public
use."

On September 10, 2013, the plaintiffs filed a complaint in the
county court "for relief in the nature of mandamus" against the
Attorney General and the Secretary of the Commonwealth,
claiming that the denial of certification was in error and seeking
an order compelling the Attorney General to certify the petition.
On September 13, the single justice, with the agreement of all
parties, entered an order, pending final decision in the case,
requiring the Attorney General to release a summary of the
initiative petition to the Secretary, who was instructed to take
all the steps that he would have been required to take under art.
48 had the petition been certified, short of printing the proposed
law in the Information for Voters guide or on the ballot. One of
those steps was for the Secretary to issue blank forms contain-
ing the Attorney General's summary, so that the plaintiffs could
attempt to obtain the required number of qualified voter signa-
tures before the deadline. The requisite signatures were timely
submitted, and as required under art. 48, The Initiative, II, § 4,
the petition was transmitted to the clerk of the House of Repre-
sentatives. No legislative action has been taken regarding the

petition. The resolution of this appeal shall determine whether the initiative petition will be decided by the voters at the November election.

Three different groups of registered voters moved to intervene in the action to present arguments not relied on by the Attorney General in her decision not to certify the petition (and rejected by the Attorney General in her brief). On February 24, 2014, the single justice allowed the motions to intervene, and reserved and reported the case to the full court.[11]

Collectively, the Attorney General and the interveners contend that there are five independent reasons why the initiative petition may not be certified in accordance with art. 48: (1) the petition, if enacted, would result in an unconstitutional taking without compensation of any gaming licenses awarded by the commission and, therefore, is inconsistent with the "right to receive compensation for private property appropriated to public use"; (2) the petition, if enacted, would result in an unconstitutional taking without compensation of a gaming license applicant's implied contractual right to a final decision by the commission regarding the license application; (3) the petition violates art. 48's exclusion of proposed measures whose "operation . . . is restricted" to particular cities or towns of the Commonwealth, because it is a measure purely of local concern to four cities or towns that would be the host communities of the licensed casinos and slots parlor; (4) the petition's subjects — the elimination of casino and slots gaming and the abolition of existing parimutuel wagering on simulcast greyhound racing — are not sufficiently related to satisfy art. 48's "related subjects" requirement; and (5) even if the petition otherwise complies with art. 48, the Attorney General's summary of the petition is not "fair" as required by art. 48. We address each of these arguments in turn.

---

[11]One group, led by voter George Ducharme, initially included five entities who had applied to the commission for gaming licenses, but these entities, none of whom is a registered voter, ultimately did not join the Ducharme interveners' brief. See *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 517 n.4 (2000). A second group consisted of voters from Springfield led by Dominic Sarno; the third group consisted of voters from Revere led by Daniel Rizzo. Sarno and Rizzo are the mayors of Springfield and Revere, respectively, but the single justice allowed them to intervene as "registered voters in their respective cities," not in their official capacities. See *id.*

*Discussion.* We review the Attorney General's decision whether to certify an initiative petition de novo. *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 520 (2000). In conducting our review, we acknowledge "the firmly established principle that art. 48 is to be construed to support the people's prerogative to initiate and adopt laws." *Carney* v. *Attorney Gen.*, 451 Mass. 803, 814 (2008) (*Carney II*), quoting *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, 403 Mass. 203, 211 (1988).

1. *Alleged taking of gaming license.* The interveners argue that, where a licensee relies on statutory inducements to obtain a license and complies with the applicable legal requirements, the licensee has "a right to conduct gaming operations in accordance with the license free from revocation at the pleasure of the Commonwealth," and the gaming license itself constitutes property that cannot be taken by the Commonwealth without just compensation. We reject this argument as wholly inconsistent with the long-standing principle that the Legislature cannot surrender its broad authority to regulate matters within its core police power, which includes the regulation of gambling and the prerogative to ban forms of gambling that previously had been legal.

In *Stone* v. *Mississippi*, 101 U.S. 814, 817, 819 (1879), the Mississippi Legislature in 1867 granted a charter to a private company to conduct a lottery in the State for twenty-five years in return for $5,000, an annual tax of $1,000, and one and one-half per cent of the lottery receipts. One year later, a provision in the Mississippi Constitution was adopted that forbade the authorization of a lottery and the sale of lottery tickets. *Id.* at 819. The plaintiffs, who were operating the lottery, claimed that the constitutional amendment did not repeal the charter because to do so would impair the obligation of contracts, in violation of art. 1, § 10, of the United States Constitution. *Id.* at 816-817. The United States Supreme Court noted that an unconstitutional impairment of the obligation of contract can only occur where there *is* a contract, and therefore asked whether the State, by granting the lottery company a twenty-five year charter, had entered into a contract that bound it irrevocably to permit a lottery for the next twenty-five years. *Id.* The Court recognized that "[w]hether the alleged contract exists . . . depends on the

authority of the legislature to bind the State and the people of
the State in that way." *Id.* at 817. The Court declared that a
"legislature cannot bargain away the police power of a State,"
that is, a Legislature cannot curtail the power of its successors
to make whatever laws they deem proper in matters within the
scope of the police power. *Id.* at 817-818. The Court determined
that, although it is difficult to define the scope of the police
power, it plainly "extends to all matters affecting the public
health or the public morals," *id.* at 818, and lotteries, as "a spe-
cies of gambling," *id.* at 821, fall squarely within the police
power, *id.* at 818. Therefore, the Court concluded that the
plaintiffs had no property interest in a lottery contract but simply
"a license to enjoy the privilege on the terms named for the
specified time, unless it be sooner abrogated by the sovereign
power of the State." *Id.* at 821. The Court warned, "Any one,
therefore, who accepts a lottery charter does so with the implied
understanding that the people, in their sovereign capacity, and
through their properly constituted agencies, may [revoke] it at
any time when the public good shall require, whether it be paid
for or not." *Id.*

Similarly, in *Mugler* v. *Kansas*, 123 U.S. 623, 653-655 (1887),
the plaintiffs built breweries when the manufacture and sale of
beer in Kansas was legal, but in 1881 the State prohibited the
manufacture and sale of "intoxicating liquors, except for medi-
cal, scientific, and mechanical purposes." The plaintiffs claimed
that prohibiting them from manufacturing beer was an uncon-
stitutional taking of property for public use. *Id.* at 664. The
United States Supreme Court rejected the taking claim, conclud-
ing that "[a] prohibition simply upon the use of property for
purposes that are declared, by valid legislation, to be injurious
to the health, morals, or safety of the community, cannot, in any
just sense, be deemed a taking or an appropriation of property
for the public benefit." *Id.* at 668-669. The Court noted that the
legislative power to protect "the health, the morals, or the
safety of the public is not — and, consistently with the exist-
ence and safety of organized society, cannot be — burdened
with the condition that the State must compensate such individual
owners for pecuniary losses they may sustain, by reason of their
not being permitted . . . to inflict injury upon the community."

*Id.* at 669. The Court acknowledged that, when the plaintiffs built their breweries, the laws of the State permitted the manufacture of beer, but declared that "the State did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged." *Id.*

We have applied the reasoning in *Stone* and *Mugler* to the regulation of various forms of gambling. We, too, recognize the difficulty in defining the police power, and have noted that it has two meanings. The core police power "includes the right to legislate in the interest of the public health, the public safety and the public morals." *Boston Elevated Ry.* v. *Commonwealth,* 310 Mass. 528, 552 (1942), quoting *Smith* v. *New England Aircraft Co.,* 270 Mass. 511, 522 (1930). The broader definition adds to the core police power "the right to legislate for the public welfare," and arguably encompasses the full breadth of State power. *Boston Elevated Ry., supra,* quoting *Smith, supra.* See *Opinion of the Justices,* 341 Mass. 760, 785 (1960); *Boston Elevated Ry., supra* at 551-553. In matters within the "narrower signification" of the police power, we have adopted the Federal rule that "the police power cannot be bargained away" by precluding future legislative change that is necessary to protect public health, public safety, and public morals. See *Opinion of the Justices, supra,* quoting *Boston Elevated Ry., supra* at 553.

The regulation of gambling has historically been recognized as a matter that falls squarely within the core police power. See *Stone,* 101 U.S. at 821; *Commonwealth* v. *Wolbarst,* 319 Mass. 291, 294 (1946) ("suppression of gambling lies within the domain of the police power of the Commonwealth"). Therefore, we have declared that "[h]orse racing with the pari-mutuel system of betting . . . is a form of gambling which has been legalized by the Legislature but which because of the nature of the business can be abolished at any time that the Legislature may deem proper for the safeguarding and protection of the public welfare." *Selectmen of Topsfield* v. *State Racing Comm'n,* 324 Mass. 309, 315 (1949). More recently, when voters in 2008 sought certification of an initiative petition that would ban pari-mutuel dog racing, we rejected the claim that the initiative would result in a taking of property without compensation from dog track owners and thereby run afoul of art. 48. See *Carney II,*

451 Mass. at 813-817. In answer to the claim that the proposed law would constitute a taking of the track owners' expectation of continued renewal of their racing licenses, we concluded that "whatever interest the plaintiffs may have in their licenses, it does not entitle them to compensation in the event that legislation duly enacted by either the Legislature or the people eliminates all parimutuel dog racing in the Commonwealth." *Id.* at 815. We noted that "gambling on dog races is a heavily regulated industry that only exists by virtue of legislatively created narrow exceptions to common-law and statutory bans," *id.* at 817, and, "because of the nature of the business," it can be abolished at any time the Legislature deems proper,[12] *id.*, quoting *Selectmen of Topsfield, supra.*

We see no reason to depart from our precedent in *Carney II.* Consequently, we conclude that, under the core police power, the Legislature and, through the initiative, the voters of Massachusetts may choose to abolish casino and slots parlor gambling and parimutuel wagering on simulcast greyhound races, and doing so would not constitute a taking of property without compensation.

In the circumstances of this case, this conclusion would not change even were we to apply the broader meaning of the police power. In matters beyond the core police power, we have not precluded the Legislature, where necessary to assure those who will be making investments beneficial to the public welfare, from binding itself and the electorate not to revoke legislation relied on by those making such investments for a reasonable number of years, or from agreeing to provide fair compensation if it were to revoke the legislation. See *Opinion of the Justices,*

---

[12]In *Carney* v. *Attorney Gen.,* 451 Mass. 803, 816-817 (2008) (*Carney II*), we cited *Members of the Peanut Quota Holders Ass'n* v. *United States,* 421 F.3d 1323, 1334 (Fed. Cir. 2005), cert. denied, 548 U.S. 904 (2006), which declared:

"The question . . . is not whether the peanut quotas have aspects of property, but whether Congress must pay the owners of peanut quotas compensation when it takes steps that render the quotas less valuable, or even valueless. The answer is no, because the property interest represented by the peanut quota is entirely the product of a government program unilaterally extending benefits to the quota holders, and nothing in the terms of the statute indicated that the benefits could not be altered or extinguished at the government's election."

341 Mass. at 785-786; *Boston Elevated Ry.*, 310 Mass. at 553-554. But where we have concluded that the Legislature bound itself to forgo future legislative change or revocation, or to provide fair compensation if it were to do so, the Legislature clearly manifested such an intent, either by describing its commitment as contractual, by expressly promising not to revoke a legislative provision, or by declaring an entitlement to fair compensation in the event of revocation. See, e.g., *Dimino* v. *Secretary of Commonwealth*, 427 Mass. 704, 708-710 (1998) (contractual obligation barred initiative to abolish tolls on Massachusetts turnpike where enabling act and trust agreements required authority to collect tolls sufficient to cover its debt obligations, and trust agreements provided that bonds were to be secured in part by revenues generated by authority); *Boston Elevated Ry.*, *supra* at 545 & n.1, 554 (Legislature may not declare right to operate elevated railway forfeited without compensation where statute provided that company's right to use location was not subject to revocation by Legislature if construction was completed within three years, and provided for fair compensation if revoked). In short, "[f]or a contract to arise from a statute there must be a clear intention of the Legislature that a statute be so interpreted." *Milton* v. *Commonwealth*, 416 Mass. 471, 475 (1993). There is no such manifestation of legislative intent here. The Legislature did not characterize the grant of a casino or slots parlor license as a contract,[13] or commit itself not to revoke the legislation it had enacted authorizing and regulating such gambling, or promise fair compensation to casinos or slots parlors if it were again to abolish such gambling. To the contrary, the act steers well clear of any language that would suggest that casino or slots parlor owners have any contractual or other entitlements that would potentially render the Commonwealth liable to compensate them for their losses.

In sum, the abolition of casino and slots parlor gambling, and of parimutuel wagering on simulcast greyhound racing, whether

---

[13]The act characterizes "any license awarded by the commission" as "a revocable privilege," not a contract, G. L. c. 23K, § 1 (9), and declares that the commission is empowered to deny, suspend, or revoke a license "for any cause that the commission deems reasonable," G. L. c. 23K, § 4 (15).

by the voters or the Legislature, would not constitute a taking of private property without compensation from those licensed to engage in such gambling operations, and therefore an initiative calling for their abolition is not inconsistent with the right to receive compensation for private property appropriated to public use. Instead, the possibility of abolition is one of the many foreseeable risks that casinos, slots parlors, and their investors take when they choose to apply for a license and invest in a casino or slots parlor. We acknowledge the arguments made by the interveners and amici that an initiative petition would put at risk the substantial investment that has been made by the applicants in applying for the casino licenses and by the slots parlor licensee in obtaining its license, including the license fee of $25 million.[14] But, as with the lottery company in *Stone* and the breweries in *Mugler*, substantial economic loss arising from a change in law under the core police power does not constitute a taking of private property that triggers an entitlement to fair compensation. We acknowledge as well the argument that the risk of abolition arising from an initiative petition might discourage the applicants from proceeding with their applications, particularly given the large investment required, or, if the initiative were to prevail, might discourage gaming companies in the future from seeking such licenses if the Legislature or the voters were again to legalize casino or slots parlor gambling. We acknowledge, too, the argument that abolition through the initiative might even affect nongambling companies' estimation of Massachusetts as a reliable place to do business. These arguments may properly be considered by the voters in deciding how to vote on the initiative, but they have no relevance to the determination whether the petition meets the legal requirements of an initiative and should be included on the November ballot.

2. *Alleged taking of implied contractual right to final deci-*

---

[14]Although the commission's regulations had initially declared license fees to be "non-refundable," an emergency amendment to those regulations removed that language. Compare 205 Code Mass Regs. § 121.01(1), (2) (effective Feb. 24, 2014), with 205 Code Mass. Regs. § 121.01(1), (2) (2013). Accordingly, the commission's regulations are now silent as to whether license fees are refundable. We do not address whether the commission may refund a license fee if the voters enact the proposed law in the initiative petition and abolish casino and slots parlor gambling.

*sion by commission regarding license applications.* The Attorney General agrees that a casino or slots parlor has no property right in a license and that the abolition of casino or slots parlor gambling would not result in a taking of any private property in such a license without just compensation. But the Attorney General nonetheless contends that the initiative petition would result in a taking without compensation because it would prohibit the commission from approving any application and, therefore, deny applicants their implied contractual right to a final determination by the commission regarding their applications. We disagree.

From a commonsense perspective, it would be peculiar if an applicant who obtains a casino or slots parlor license and pays the licensing fee has no property right arising from contract in the license, but an applicant who seeks a license has a property right arising from contract to a determination by the commission whether it should receive a license that it will not be able to use if casino and slots gambling is abolished. Implicit in the Attorney General's argument is that, because gambling falls within the core police power, there is no contractual right to a gaming license, but the application for a gaming license is separate and distinct from the operation of a gaming establishment and therefore falls outside the scope of the police power. We reject this distinction and this departure from common sense. The application for a gaming license is a necessary prerequisite to obtain a gaming license, and legislation governing who, if anyone, is eligible to receive such a license is as much within the scope of the core police power as legislation regarding the license itself. The same core police power that authorizes the Legislature (or, as here, the voters acting through the initiative) to abolish casino and slots parlor gambling also authorizes the cessation of the process that otherwise might result in the award of a gaming license.

The Attorney General rests her conclusion that an applicant has an implied contractual right to a final determination by the commission regarding its application for a gaming license on appellate case law interpreting the public bidding law, G. L. c. 149, §§ 44A-44J. The Appeals Court has held that where a public contracting authority did not give fair consideration to a

properly submitted bid in accordance with the law, the public contracting authority broke the implied contract formed by the submission of the bid, and the bidder was entitled to recover the costs of preparing the bid. See *Paul Sardella Constr. Co.* v. *Braintree Hous. Auth.*, 3 Mass. App. Ct. 326, 333 (1975), *S.C.*, 371 Mass. 235 (1976) (*Sardella*). See also *E. Amanti & Sons* v. *Barnstable*, 42 Mass. App. Ct. 773, 778 (1997). The Appeals Court reasoned in *Sardella, supra* at 334:

> "The award of reasonable bid preparation costs for the failure to give fair consideration to a bidder in accordance with the statutory procedure will best effectuate the legislative objectives underlying the statute by insuring the widest competition among responsible bidders. Notwithstanding possible short-term benefit to an awarding authority in a particular case through violation of the statute, over the longer term harm to the public interest would ensue if awarding authorities are not to be held accountable for their violations. The number of bidders, and thus the range of choice available to an awarding authority, may well be reduced if it were to be assumed by prospective bidders that such an authority would not abide by the applicable statutes in making its awards."

The Attorney General acknowledges that the "analogy" between competitive bidding under the public bidding law and the application for a casino or slots parlor license "is not perfect," but fails to recognize that it is fundamentally flawed. First, public bidding is part of a process that leads to a contract between the awarding authority and the prevailing bidding contractor for the construction or repair of a public building, so it is reasonable to imply a contractual obligation by the awarding authority to act in accordance with the statute in deciding who will be the bidder awarded the contract. In contrast, an application for a casino or slots parlor license is not part of a process that may lead to a contract between the commission and the applicant; if the applicant prevails, it will receive only a license, that is, "a revocable privilege." G. L. c. 23K, § 1 (9).

Second, the rationale for the implied contract in *Sardella* was to ensure that the awarding authority would comply with the

statutory bidding law and thereby encourage bid competition by assuring potential bidders that they would be considered in accordance with law. *Sardella*, 3 Mass. App. Ct. at 332-333, quoting *Interstate Eng'g Corp.* v. *Fitchburg*, 367 Mass. 751, 758 (1975). In contrast, the implied contract proposed by the Attorney General would be wholly divorced from this rationale. If the initiative were to be enacted, the commission would be complying with the law, not violating it, by declining to approve an application. There would be no statutory purpose in encouraging applicants, because no gaming licenses would be issued by the commission. Moreover, the implied contract proposed by the Attorney General would in essence interpret the act as providing applicants with an enforceable legal right to a determination by the commission regarding their application, even though the act provides applicants with no enforceable legal rights and contains strong language suggesting that the Legislature intended to give them none. See G. L. c. 23K, § 17 (*g*) ("Applicants shall have no legal right or privilege to a gaming license . . ."). There is no language in the act or other reason to believe that the Legislature intended to give applicants an implied contractual right to a decision regarding their applications.

Third, even if the Legislature had intended to create an implied contractual right to a licensing decision by the commission, an implied condition of any such contract would be that casino and slots parlor gambling remains legal and that a gaming license would actually permit the opening of a gaming establishment. The Attorney General contends that, even if such gambling were abolished in the Commonwealth, the award of a license would still be of value to an applicant because validation by the commission might persuade licensing authorities in other States to award the applicant a comparable license. But the Legislature established the commission as a licensing authority, not a validation authority, and could not reasonably have anticipated that it would proceed to render licensing decisions if casino and slots parlor gambling were abolished by the electorate. See G. L. c. 23K, § 2 ("Applicant" defined as "a person who has applied

for a license to *engage in activity* regulated under this chapter" [emphasis added]).[15]

We conclude that an applicant for a gaming license has no implied contractual right to a final decision by the commission regarding its license application. Therefore, we conclude that the Attorney General erred in determining that the initiative's prohibition of the approval of such an application would constitute a taking that is inconsistent with the right to receive compensation for private property appropriated to public use.

3. *Local matters exclusion.* The Springfield group of interveners argues that the petition violates art. 48 because it proposes a measure whose operation would be restricted to particular municipalities within the Commonwealth. Article 48 states in relevant part that "[n]o measure . . . the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth . . . shall be proposed by an initiative petition." Art. 48, The Initiative, II, § 2. This is often referred to as the "localities" or "local matters" exclusion.[16]

The purpose of the local matters exclusion is to ensure that only matters of Statewide concern are put before the voters in an initiative petition. Matters of purely local or regional concern are not appropriately decided by all Massachusetts voters. See *Carney II*, 451 Mass. at 811; *Thompson* v. *Attorney Gen.*, 413 Mass. 21, 23 (1992); *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 224 (1981). See also 2 Debates in the Massachusetts Constitutional Convention 1917-1918, 693 (1918) ("the intention was to exclude purely local matters, matters that were not State wide matters").

The local matters exclusion, however, "does not require that

---

[15]At oral argument, the Attorney General contended that, if the initiative were to pass, applicants whose applications were still awaiting a phase one or phase two determination by the commission would be entitled to a refund of the fees paid to obtain such a determination. We reject this contention for two reasons: applicants have no implied contractual right to a final determination by the commission, and the act declares that application fees are nonrefundable. See G. L. c. 23K, § 15 (11).

[16]The Attorney General did not expressly address the local matters exclusion in her letter denying certification. In her brief on appeal, she argues that the local matters exclusion does not apply to this initiative petition.

a proposed statute have uniform, Statewide application." *Carney II, supra,* quoting *Massachusetts Teachers Ass'n,* 384 Mass. at 224. That a measure might affect some municipalities more than others and differently from others does not necessarily mean that it is prohibited under the local matters exclusion. See, e.g., *Carney II, supra* at 810-813 (initiative petition proposing Statewide ban on parimutuel dog racing not prohibited by local matters exclusion, even though dog racing tracks operated in only two municipalities); *Ash* v. *Attorney Gen.,* 418 Mass. 344, 347-348 & n.7 (1994) (initiative petition proposing Statewide ban on rent control not prohibited by local matters exclusion, even though only seven municipalities were authorized by Legislature to adopt some form of rent control or review); *Massachusetts Teachers Ass'n, supra* at 222-226 (initiative petition proposing Statewide two and one-half per cent limit on municipal property tax rate not prohibited by local matters exclusion, even though it would result in "different consequences in various municipalities" depending on existing property tax rates).

The crucial question is whether the measure is "restricted" to particular municipalities. "A proposed act, which on its face applied uniformly to all municipalities in the Commonwealth, is not excluded from the initiative process . . . ." *Ash,* 418 Mass. at 348. To be excluded under the local matters exclusion, "the restriction to a particular town, city or other political subdivision or to particular districts or localities must be specified in the law itself in terms which expressly or by fair implication are geographically descriptive of territorial divisions of the Commonwealth." *Mount Washington* v. *Cook,* 288 Mass. 67, 74 (1934), cited with approval in *Carney II,* 451 Mass. at 811; *Ash, supra* at 348; and *Massachusetts Teachers Ass'n,* 384 Mass. at 224.

The initiative petition in this case is plainly a matter of Statewide — not mere local or regional — concern. It seeks to prohibit casinos, slot machines, and all games conducted under G. L. c. 23K, and parimutuel wagering on simulcast greyhound races under G. L. c. 128C, in *all* cities and towns in Massachusetts, not just in those cities and towns where they are presently licensed or where license applications are being considered. In this respect, it is not meaningfully different from the measures

banning live dog racing and rent control, respectively, in the *Carney II* and *Ash* cases. Those municipalities in which the G. L. c. 23K licensing process is already underway or in which simulcast greyhound wagering already exists pursuant to G. L. c. 128C, like the municipalities that hosted dog racing in *Carney II* or imposed rent control in *Ash*, stand to be affected differently from others, but that would be nothing more than a practical consequence of enacting a Statewide ban. It does not mean that the ban, or the effect of the ban, would be restricted to those municipalities within the meaning of the local matters exclusion.

Moreover, although the economic impact of the Statewide ban proposed in the initiative would be greatest on the host communities (or prospective host communities), the impact would be Statewide. The anticipated jobs from the construction and operation of the planned casinos and slots parlor would not be limited to those residing in the host communities; nor would the visitors to the casinos and slots parlor come only from the host communities. The tax revenues anticipated from the operation of these establishments, and from the income earned by contractors and employees, would have Statewide impact. The adverse consequences of casino and slots parlor gambling claimed by some of the amici, including an increase in those suffering the psychological, social, and economic effects of "gambling disorder," an increase in the rate of bankruptcies, especially among restaurants, and higher crime rates, if they were to occur, would also not be limited to residents of the host communities and would be felt Statewide.

In short, a measure that would significantly change the statutory definition of "illegal gaming" that applies Statewide, with the objective of prohibiting casinos, slots parlors, and simulcast greyhound wagering throughout the entire Commonwealth, is quintessentially the type of Statewide matter that may be addressed under art. 48 in an initiative petition. Nothing in the measure, either expressly or by fair implication, restricts its operation to particular municipalities within the meaning of the local matters exclusion.

4. *Related subjects requirement.* All three groups of interveners contend that the initiative petition cannot be placed on the

ballot because it violates the so-called "relatedness" or "related subjects" requirement of art. 48, which states that an initiative petition must "contain[] only subjects . . . which are related or which are mutually dependent."[17] Art. 48, The Initiative, II, § 3, as amended by art. 74. The decisions of this court illustrate how we have endeavored to construe the related subjects requirement in a balanced manner that fairly accommodates both the interests of initiative petitioners and the interests of those who would ultimately vote on the petition. On the one hand, the requirement must not be construed so narrowly as to frustrate the ability of voters to use the popular initiative as "the people's process" to bring important matters of concern directly to the electorate; the delegates to the constitutional convention that approved art. 48 did, after all, permit more than one subject to be included in a petition, and we ought not be so restrictive in the definition of relatedness that we effectively eliminate that possibility and confine each petition to a single subject. See *Massachusetts Teachers Ass'n*, 384 Mass. at 219-220 & nn.9, 10. On the other hand, relatedness cannot be defined so broadly that it allows the inclusion in a single petition of two or more subjects that have only a marginal relationship to one another, which might confuse or mislead voters, or which could place them in the untenable position of casting a single vote on two or more dissimilar subjects. See generally *Carney* v. *Attorney Gen.*, 447 Mass. 218, 224-232 (2006) (*Carney I*).

Thus, in the *Massachusetts Teachers Ass'n* case, the court described the governing standard as "[w]hether the subjects dealt with in [the petition] are germane to a general subject, at least to the extent that one cannot rightly say that they are unrelated." *Id.* at 219, citing *Opinion of the Justices*, 309 Mass. 555, 561 (1941). The court explained:

> "Of course, the general subject of an initiative proposal cannot be so broad as to render the 'related subjects' limitation meaningless. If, however, one can identify a common purpose to which each subject of an initiative petition can reasonably be said to be germane, the relatedness test is

---

[17]The Attorney General did not reach the issue of relatedness in her letter denying certification, but she argues in her brief that the proposed initiative petition satisfies the relatedness test.

met. It is not for the courts to say that logically and con-
sistently other matters might have been included or that
particular subjects might have been dealt with differently.
Unlike the situation in other States, the single subject
concept has not been a part of the legislative process in
this Commonwealth, and we see no justification for import-
ing that concept into the less restrictive limitation of 'related
subjects' " (footnote omitted).

*Massachusetts Teachers Ass'n, supra* at 219-220. See *Albano* v.
*Attorney Gen.*, 437 Mass. 156, 161 (2002); *Mazzone* v. *Attorney
Gen.*, 432 Mass. at 528-529 ("We have not construed this re-
quirement narrowly nor demanded that popular initiatives be
drafted with strict internal consistency. . . . We have, instead,
required only that the subjects of a petition have a 'common
purpose' " [citations omitted]).

In the *Carney I* case, we began by quoting with approval the
principles set forth in the *Massachusetts Teachers Ass'n* and
*Mazzone* cases, but went on to add significant language ensur-
ing that the related subjects requirement would not be defined
too broadly:

> "The relatedness limitation requires the Attorney General
> to scrutinize the aggregation of laws proposed in the initia-
> tive petition for its impact at the polls. At some high level
> of abstraction, any two laws may be said to share a 'com-
> mon purpose.' The salient inquiry is: Do the similarities of
> an initiative's provisions dominate what each segment
> provides separately so that the petition is sufficiently coher-
> ent to be voted on 'yes' or 'no' by the voters? That is the
> crux of the relatedness controversy. . . . This question is
> not susceptible to bright-line analysis.
>
> ". . .
>
> "The language, structure, and history of art. 48 all sug-
> gest that any initiative presenting multiple subjects may
> not operate to deprive the people of a 'meaningful way' to
> express their will. . . . It is not enough that the provisions
> in an initiative petition all 'relate' to some same broad
> topic at some conceivable level of abstraction. . . . To
> clear the relatedness hurdle, the initiative petition must

express an operational relatedness among its substantive
parts that would permit a reasonable voter to affirm or
reject the entire petition as a unified statement of public
policy. A broader interpretation of the common purpose
requirement would undercut the very foundations of the
relatedness limitation." (Citations omitted.)

*Carney I*, 447 Mass. at 225, 226, 230-231.

The provisions of the proposed measure in this case share a
significant "common purpose," are not so loosely tied together
as to render the related subjects requirement meaningless, and
are operationally related in a way that would "permit a reason-
able voter to affirm or reject the entire petition as a unified
statement of public policy." The measure would redefine "il-
legal gaming" in a way that is intended to prohibit casinos,
slots parlors, and simulcast greyhound wagering. It is, in its es-
sence, a measure to limit the forms of gambling. The operational
connection is that these three particular types of gaming, cur-
rently permitted under the laws of the Commonwealth, all
regulated or to be regulated by the commission, would effectively
be rendered illegal. Moreover, these three types of gaming are
themselves operationally related. Casinos typically offer table
games, slot machines, and wagering on simulcast live dog racing.
The commission may grant a simulcasting license only to casino
and slots parlor licensees, and to those previously licensed to
conduct horse or dog racing under G. L. cc. 128A and 128C.[18]
G. L. c. 23K, § 7 (*b*). The unified statement of public policy
reflected in the petition is the constriction of the types of gam-
ing permitted by law in Massachusetts, and a reasonable voter
would be given a meaningful opportunity to decide whether to
continue to legalize these three forms of gaming, or to prohibit
them and thereby limit legal gambling in Massachusetts es-
sentially to horse racing, lotteries, and charity events. There is
no likelihood that a reasonable voter would find this petition
confusing or misleading.

The interveners rely heavily on the *Carney I* decision to sup-
port their contention that the subjects of the present petition are

_____

[18]Where a slots parlor licensee already had a simulcasting license under
G. L. c. 128C as of July 1, 2011, a condition of its slots parlor license is to
continue to conduct simulcast wagering. G. L. c. 23K, § 20 (*b*).

not related within the meaning of art. 48. The facts in *Carney I*, however, were markedly different. In that case, the initiative petitioners combined within a single petition two very different types of changes to Massachusetts law. The proposed measure, entitled "An Act to protect dogs," declared that its purpose was to "further protect dogs and puppies in the state." *Carney I*, 447 Mass. at 219, 220 n.7. The first two substantive sections of the measure would have added or amended certain criminal statutes aimed directly at punishing those who abuse or neglect dogs. *Id.* at 221-222. The final substantive section would have dismantled the parimutuel dog racing business in Massachusetts, *id.* at 222, a business that the court described as "an established, highly regulated enterprise" that had been operating legitimately in Massachusetts for more than seventy years. *Id.* at 219-220. Very significantly, the latter provision was identical to an initiative petition that had been submitted to, and narrowly rejected by, the voters six years earlier. *Id.* at 222. It was in this context that the court concluded that the subjects of the petition did not bear the requisite relatedness to one another, that they could be said to be "related" only at an impermissibly high level of abstraction (protecting dogs), and that the proponents were engaged in the sort of "logrolling" that the delegates sought to prevent when they adopted the related subjects requirement of art. 48.[19] *Id.* at 227, 231-232. The very controversial proposal to prohibit parimutuel dog racing had been hitched to the more popular, less controversial proposal to toughen the criminal laws regarding the abuse and neglect of dogs, thereby placing voters in the position of having to vote up or down a single petition that did not express "a unified statement of public policy." *Id.* at 231-232.

In contrast, all the provisions in the petition before us can reasonably be understood to be antigaming provisions, meant to redefine (and limit) the scope of permissible gambling in the Commonwealth. That is the "common purpose" to which all the provisions are "germane." *Massachusetts Teachers Ass'n,*

---

[19] " 'Logrolling' . . . is defined as '[t]he legislative practice of including several propositions in one measure . . . so that the legislature or voters will pass all of them, even though these propositions might not have passed if they had been submitted separately.' " *Carney* v. *Attorney Gen.*, 447 Mass. 218, 219 n.4 (2006), quoting Black's Law Dictionary 960 (8th ed. 2004).

384 Mass. at 219-220. That is the dominant thrust of each provision and the "operational relatedness" among them. *Carney I*, 447 Mass. at 230. And, in contrast with the petition in *Carney I*, the petition does not contain a radically diverse "mixture of criminal law and administrative overhaul." *Id.* at 231.

It is not fatal to the petition that the proposed measure does not seek to prohibit all forms of gambling in Massachusetts. The "unified statement of public policy" called for by *Carney I*, 447 Mass. at 230-231, does not require that an initiative petition be a comprehensive piece of legislation that would entirely cover its field. It requires that the portion of the field covered by the petition be presented in a way that permits a reasonable voter to make an intelligent up or down choice. See *id.* at 226. Provided the subjects are sufficiently related, the choice as to the scope of an initiative petition is a matter for the petitioners, not the courts. *Massachusetts Teachers Ass'n*, 384 Mass. at 220 ("It is not for the courts to say that logically and consistently other matters might have been included or that particular subjects might have been dealt with differently").

Nor is it necessary that all of an initiative's supporters share the same motivations. The interveners note that some of the supporters appear to be interested primarily in prohibiting the licensing of casinos and a slots parlor, with less concern for simulcast greyhound wagering, while another faction of supporters appears to be interested primarily in the protection of greyhounds, with less concern for casinos and a slots parlor. Evidence of differing motivations is relevant to the relatedness analysis, because it might bear on the likelihood of "logrolling," but it is far from dispositive. Where, as here, the petition's provisions are operationally related with a common purpose and set forth a unified statement of public policy, all who favor the petition need not support it for the same reason.

Finally, we reject the interveners' argument that the subjects of the petition are not related because the measure's change in the definition of "illegal gaming" would have consequences under an assortment of other statutes as well. See, e.g., G. L. c. 139, § 19 (allowing lessor to void lease when tenant engages in, among other things, illegal gaming); G. L. c. 180, § 5 (providing for review of proposed charitable corporations to determine

whether any proposed incorporators, officers, or other principals have been engaged in, among other things, illegal gaming, such that proposed corporation would be used to cover or shield illegal business or practices); G. L. c. 271, § 22 (punishing receipt and delivery of certain letters and packages connected to illegal gaming); G. L. c. 271, § 47 (placing restrictions on installation of telephones for persons convicted of illegal gaming). Each of the affected statutes is itself logically related to the petition's aim to curtail illegal gaming by limiting the types of gaming that are permitted. "A measure does not fail the relatedness requirement just because it affects more than one statute, as long as the provisions of the petition are related by a common purpose." *Albano*, 437 Mass. at 157-158, 161-162 (rejecting relatedness challenge to initiative measure that would have restricted civil marriage to "union of one man and one woman" and denied "benefits or incidents exclusive to marriage" to other relationships even though enactment of that measure would have affected "various statutes that relate to rights and responsibilities of marriage, including those laws that affect one's ability to inherit, to file taxes, to make medical decisions about a spouse, and to file wrongful death claims").

In sum, we agree with the Attorney General that the initiative petition in this case satisfies the related subjects requirement of art. 48.

5. *Attorney General's summary.* Finally, the interveners contend that the Attorney General's summary of the proposed measure does not meet the requirements of art. 48. Article 48, as amended by art. 74, calls for the crafting of a "fair" and "concise" summary, "as determined by the attorney general." This summary is required to be printed on the pages used by initiative petitioners to gather the required voter signatures (art. 48, The Initiative, II, § 3, as amended by art. 74); on the ballot itself (art. 48, The Initiative, III, as amended by art. 74); and in the Information for Voters booklet sent by the Secretary to registered voters before the election (art. 48, The Initiative, IV, as amended by art. 74). The Attorney General's summary of the measure in this case states:

"This proposed law would (1) prohibit the Massachusetts

Gaming Commission from issuing any license for a casino or other gaming establishment with table games and slot machines, or any license for a gaming establishment with slot machines; (2) prohibit any such casino or slots gaming under any such licenses that the Commission might have issued before the proposed law took effect; and (3) prohibit wagering on the simulcasting of live greyhound races.

"The proposed law would change the definition of 'illegal gaming' under Massachusetts law to include wagering on the simulcasting of live greyhound races, as well as table games and slot machines at Commission-licensed casinos, and slot machines at other Commission-licensed gaming establishments. This would make those types of gaming subject to existing state laws providing criminal penalties for, or otherwise regulating or prohibiting, activities involving illegal gaming.

"The proposed law states that if any of its parts were declared invalid, the other parts would stay in effect."

The interveners challenge the summary's fairness, not its conciseness. To be "fair," a summary "must not be partisan, colored, argumentative, or in any way one sided, and it must be complete enough to serve the purpose of giving the voter who is asked to sign a petition or who is present in a polling booth a fair and intelligent conception of the main outlines of the measure." *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 324 (1951). "The Attorney General is not required to conduct a comprehensive legal analysis of the measure, including possible flaws. All the Constitution demands is a summary." *Mazzone*, 432 Mass. at 532. See *Ash*, 418 Mass. at 349-350; *Associated Indus. of Mass.* v. *Secretary of the Commonwealth*, 413 Mass. 1, 12 (1992) ("Nothing in art. 48 requires the summary to include legal analysis or an interpretation"). Moreover, as we review the summary to determine whether the Attorney General has fulfilled her constitutional obligation, we keep in mind that "[t]he Attorney General's judgment concerning the form and content of the summary is entitled to some deference." *Id.* at 11. "Obviously, an element of discretion is involved in the

preparation of a summary — what to include, what to exclude, and what language to use. The exercise of discretion by the Attorney General, a constitutional officer with an assigned constitutional duty, should be given weight in any judicial analysis of the fairness and adequacy of a summary." *Massachusetts Teachers Ass'n*, 384 Mass. at 230.

The interveners' primary challenge to the summary in this case is that it inaccurately states that the proposed measure would "change the definition of 'illegal gaming' under Massachusetts law to include wagering on the simulcasting of live greyhound races," and thus "prohibit wagering on the simulcasting of live greyhound races." They claim, in essence, that the measure does not accomplish what the petitioners intend, that is, that the measure, even if enacted, would not actually prohibit wagering on the simulcasting of live greyhound races. They argue that the "base definition" of "illegal gaming" in G. L. c. 4, § 7, Tenth, i.e., "a banking or percentage game played with cards, dice, tiles or dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks, credit or any representative of value," does not include wagering on the simulcasting of live greyhound races, so the measure's striking of the exclusion for parimutuel wagering on "greyhound races under said [c.] 128C" in G. L. c. 4, § 7, Tenth, would have no practical consequence, because parimutuel wagering on greyhound races would still not fall within the definition of "illegal gaming."

The Attorney General, in defense of her summary, argues that parimutuel wagering on simulcast greyhound races is included within the base definition of "illegal gaming" in G. L. c. 4, § 7, Tenth, because it is a "percentage game" in that the licensee takes a percentage of the total amount wagered, see G. L. c. 128A, § 5, and *Donovan* v. *Eastern Racing Ass'n, Inc.*, 324 Mass. 393, 396 (1949); it is "gaming" in that it involves bets on the physical ability of animals, see *id.* at 394; and it is "played with . . . an electronic, electrical or mechanical device or machine" because, she maintains, all winnings are required by statute to "be calculated by a totalisator machine or like machine." See G. L. c. 128A, § 5 (*a*). She also argues that the Legislature, when it amended G. L. c. 4, § 7, Tenth, in 2011,

must have understood simulcast greyhound wagering to be within the base definition of "illegal gaming," because it expressly listed it among the exclusions from that definition for the purpose of making it lawful when conducted by a licensee under G. L. c. 128C.

We acknowledge the disagreement regarding whether the initiative, if enacted, will have the intended effect of prohibiting parimutuel wagering on simulcast greyhound races, and we further recognize that, if the measure is enacted, this court may be called on to resolve that question. Notwithstanding the disagreement, the Attorney General must still craft a fair summary and, in doing so, must inevitably form her own understanding of the meaning of the language in the initiative and its operation and effect.[20] We give deference to the judgment of the Attorney General regarding the content of the summary. *Associated Indus. of Mass.*, 413 Mass. at 11. Because, for the reasons she has stated, her understanding of the measure is reasonable, and because her understanding is plainly consistent with what is intended by the initiative's proponents, we conclude that her summary is fair. And because the summary will accurately inform the voters of precisely what they are being asked to do with respect to wagering on simulcast greyhound racing — that is, abolish it — a reasonable voter cannot possibly misunderstand the measure's intended effect.

We decline the interveners' invitation to resolve now the dispute whether the interveners' or the Attorney General's interpretation of the measure is correct as a matter of law. The same general principles that restrain us from deciding, before an initiative measure is passed, whether the measure would be unconstitutional (except for deciding whether the measure's subjects are "excluded matters" under art. 48) also counsel restraint in deciding whether a measure would or would not have the legal effect intended. See *Carney II*, 451 Mass. at 820-821 (noting "pragmatic concerns about ripeness" and constitu-

---

[20]Such a disagreement about the effectiveness of language of an initiative petition is not itself a reason for the Attorney General to decline to certify the petition, provided the petition proposes a law, which it does here. See *Paisner v. Attorney Gen.*, 390 Mass. 593, 597-598 (1983). The interveners do not dispute that the petition proposes a law.

tionally rooted limitations on court's power to interfere with legislative process in progress); *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 247 (1946) ("The people acting by means of the initiative, like the General Court, can enact measures that violate the fundamental and supreme law of the Constitution and that consequently have no force or effect. But no court can interfere with the process of legislation, either by the General Court or by the people, before it is completed, to prevent the possible enactment of an unconstitutional measure"). See also *Mazzone*, 432 Mass. at 532 (rejecting argument that summary was unfair because it did not mention aspect of initiative that challengers claimed violated Federal law). In circumstances like these, the proper time for deciding definitively whether the measure has the desired legal effect will come if and when the measure is passed.[21] In the meantime, the pros and cons of the measure, including its possible legal flaws, are best left to public debate in the electoral process. See *id.* at 532-533. See also *Gilligan* v. *Attorney Gen.*, 413 Mass. 14, 20 (1992); G. L. c. 54, §§ 52-54.

We can dispose quickly of the interveners' remaining challenges to the summary. They claim, first, that the proposed measure's deletion of the phrase "and greyhound races under [c.] 128C" is ineffectual because, as part of the act, c. 128C has been repealed effective July 31, 2014 (see St. 2011, c. 194, §§ 41, 112), and, as of that date, the commission will have the responsibility under G. L. c. 23K for administering and enforcing the laws related to parimutuel wagering and simulcasting

---

[21]We are also mindful that, in circumstances like these, if the sponsors of an initiative petition have any residual doubt about the effectiveness of what they have proposed, they can pursue a perfecting amendment to ensure that the measure accomplishes what they intend it to do and what the Attorney General's summary states that it does. See art. 48, The Initiative, V, § 2, as amended by art. 81. See also *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 236-238 (1981) (upholding perfecting amendment that came after signatures were gathered and Legislature rejected measure; "No one was misled significantly by the error in the draftsmanship. The summary correctly stated the purpose of the proposal, although the summary and the text were incongruous until the perfecting change was made. Signatures were obtained pursuant to the summary. The change permitted the people to vote on the proposal in the form in which it was intended"). We ought not interrupt a process in progress because of a claimed error, when the error, if any, can be cured.

(see St. 2011, c. 194, §§ 11, 12, 17).[22] The gist of this claim, like the one previously discussed, is that the proposed measure will not have its intended effect. The Attorney General reasonably disputes that legal analysis. For essentially the same reasons as stated above, we conclude that a definitive resolution of the issue at this time would be premature, and that the interveners' claim that the proposed measure is ineffectual on this ground does not render the Attorney General's summary unfair.

Second, the interveners argue that the summary is unfair because it states that "wagering on the simulcasting of live greyhound races" would henceforth be prohibited, whereas, according to the interveners, only parimutuel wagering would be prohibited. The absence of the word "parimutuel" from the summary is not fatal, as no other form of simulcast wagering is presently permitted. See G. L. c. 128A, § 13. The summary clearly captures the "sum and substance" of the measure in this regard. *Sears*, 327 Mass. at 324. No additional level of detail is needed. See *Gilligan*, 413 Mass. at 19-20; *Associated Indus. of Mass.*, 413 Mass. at 11-12.

Finally, the interveners claim that the summary is unfair in stating that if any of the "parts" of the proposed law "were declared invalid, the other parts would stay in effect," because a severability clause is inconsistent with art. 48's requirement that the subjects of an initiative petition be related. As with their other arguments, this is not an attack on the summary itself, but on the measure. Where § 3 of the proposed law states that "[t]he several provisions of this Act are independent and severable and the invalidity, if any, of any part . . . shall not affect or render the remainder of the Act invalid or operative," the summary's statement regarding severability is a fair and accurate description, and it was prudent for the Attorney General to include it. See *Massachusetts Teachers Ass'n*, 384 Mass. at 233 (in postelection constitutional challenge to enacted initiative, summary's failure to mention severability language might have been problematic if court had not rejected all challenges to its constitutionality). The legal effect of the severability language will ultimately be decided if and when the measure passes, the

---

[22]The Attorney General notes in her brief that the commission is presently seeking legislation that would postpone these changes for two years.

law is challenged, and one or more of its provisions is held invalid.

*Conclusion.* For the reasons stated above, we remand the case to the county court for entry of an order directing the Attorney General to certify the initiative petition.

*So ordered.*

APPENDIX.

## An Act Relative to Illegal Gaming

Be it enacted by the people and their authority:

SECTION 1.

Section 7 of chapter 4 of the General Laws, as appearing in the 2012 Official Edition, is hereby amended by striking out clause Tenth and inserting in place thereof the following clause:

"Tenth, 'Illegal gaming,' a banking or percentage game played with cards, dice, tiles or dominoes, or an electronic, electrical or mechanical device or machine for money, property, checks, credit or any representative of value, but excluding: (i) a lottery game conducted by the state lottery commission, under sections 24, 24A and 27 of chapter 10; (ii) pari-mutuel wagering on horse races under chapters 128A and 128C; (iii) a game of bingo conducted under chapter 271; and (iv) charitable gaming under said chapter 271."

SECTION 2.

Chapter 23K of the General Laws, as appearing in the 2012 Official Edition, is hereby amended by adding the following section 72 following section 71:

"Notwithstanding the provisions of this chapter or any general or special law to the contrary, no illegal gaming as defined in section 7 of chapter 4 shall be conducted or permitted in this commonwealth and the commission is hereby prohibited from accepting or approving any application or request therefor."

SECTION 3.

The several provisions of this Act are independent and severable and the invalidity, if any, of any part or feature thereof shall not affect or render the remainder of the Act invalid or inoperative.