# United States Court of Appeals
## For the First Circuit

No. 14-1681

CAESARS MASSACHUSETTS MANAGEMENT COMPANY, LLC,
CAESARS MASSACHUSETTS DEVELOPMENT COMPANY, LLC,
CAESARS MASSACHUSETTS INVESTMENT COMPANY, LLC, and
CAESARS ENTERTAINMENT CORPORATION,

Plaintiffs, Appellants,

v.

STEPHEN P. CROSBY
and KAREN WELLS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before
Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Joan A. Lukey, with whom C. Thomas Brown, Eugene L. Morgulis, Ropes & Gray LLP, Justin J. Wolosz, and Choate Hall & Stewart LLP, were on brief, for appellants.
John M. Stephan, Assistant Attorney General, with whom Martha Coakley, Attorney General of Massachusetts, Janna J. Hansen, Assistant Attorney General, and Julia Kobick, Assistant Attorney General, were on brief, for appellees.

February 13, 2015

---

[*]     Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.** The plaintiff-appellant Caesars Entertainment Corporation and three Massachusetts affiliates (collectively, Caesars) were subject to an investigatory report by the Massachusetts Gaming Commission finding them unsuitable as proposed operators of a casino for which Sterling Suffolk Racecourse, LLC (SSR) sought a license. This action brought by Caesars under 28 U.S.C. § 1983 includes counts with (a) official capacity claims charging denial of Fifth and Fourteenth Amendment procedural and substantive due process and equal protection of the laws by the Commission's chairman, Stephen Crosby, and Karen Wells, Director of the Commission's Investigations and Enforcement Bureau (IEB), and seeking withdrawal of the report and cessation of any further reliance on it by the Commission; (b) individual capacity claims against Crosby on the same grounds, seeking compensatory and punitive damages; and (c) a claim subject to supplemental jurisdiction for liability under Massachusetts law for tortious interference with a contract between Caesars and SSR. The district court dismissed the federal claims under Federal Rule of Civil Procedure 12(b)(6) as beyond the scope of federal affordable relief, and consequently exercised its discretion to dismiss the state law claim as standing alone. This appeal touches on a multiplicity of legal and factual issues including Eleventh Amendment state immunity, qualified immunity of individuals, control of IEB by Crosby as chairman of the Commission, and

theories of protected property, among others.  In our review de novo, however, we affirm the dismissal on two pivotal grounds: Caesars has alleged no cognizable protected property interest said to have been infringed in violation of Fifth and Fourteenth Amendment due process, and class-of-one Fourteenth Amendment equal protection does not extend to redress action taken under state law authorizing the exercise of highly discretionary judgment in response to an application to license activity carrying substantial risks of commercial and social harm.

I.

Caesars' third amended complaint, together with documents incorporated by reference and matters of public record subject to judicial notice, see Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008), disclose the following facts as of relevant times, to be taken as true under Rule 12(b)(6).  Under the authority of the Massachusetts Expanded Gaming Act, 2011 Mass. Acts ch. 194 (largely codified at Mass. Gen. Laws ch. 23K), the Commonwealth of Massachusetts is in the throes of licensing casinos, one for each of three regions of the state.  The statute assigns that responsibility to a Gaming Commission of five members, of which the defendant-appellee Stephen Crosby is chairman.  The IEB is the Commission's investigatory arm for examining the suitability of applicants for a casino license and of persons and corporations affiliated with an applicant to exercise the license sought (spoken

of as "qualifiers"). As noted, the applicant for one such license is SSR, a corporation doing business in Massachusetts and not a party to this action, and Caesars is a qualifier. SSR wishes to place a casino in Revere and East Boston.

The IEB's enquiry into Caesars' conduct of business in Nevada and elsewhere led to a public report recommending that the Commission find that Caesars had not carried its burden to demonstrate its suitability by clear and convincing evidence; a near-certain consequence of the report would be denial of SSR's application. The IEB gave four reasons: (1) through a subsidiary, Caesars entered into a licensing agreement with Gansevoort Hotel Group, LLC, which is partially owned by an individual with alleged ties to Russian organized crime; (2) Caesars hired Mitchell Garber, who had formerly served as the chief executive officer of two internet gambling companies that entered into non-prosecution agreements with the United States Attorney's Office for the Southern District of New York; (3) Caesars had a history with Terrance Watanabe, a former high roller, who sued Caesars for allegedly encouraging him to gamble while intoxicated; and (4) Caesars was highly leveraged, to the point that its monthly debt service exceeded its cash flow.[1]

---

[1] On January 15, 2015, Caesars' largest subsidiary, Caesars Entertainment Operating Corporation, filed for Chapter 11 bankruptcy protection. See Chapter 11 Voluntary Petition, In re Caesars Entertainment Operating Company, Inc., No. 15-bk-1145 (Bankr. N.D. Ill. Jan. 15, 2015), ECF No. 1.

A competing application was filed by Wynn Resorts, Limited, for a site in nearby Everett. One of the owners of the Everett real estate is Paul Lohnes, a long-time acquaintance of Crosby's, who in the past had invested in one of Crosby's business enterprises (allegedly at a loss) in which he had actively participated. When word circulated that a previously undisclosed co-owner of the Everett land had a felony record, Crosby told his fellow commissioners of his relationship with Lohnes and subsequently informed both the Governor, as required by law, and the Massachusetts Ethics Commission, which advised that, so long as Crosby used "objective criteria," he was not disqualified to act on the competing applications by reason of his relationship with Lohnes. A short while after that, Crosby disclosed the relationship publicly and recused himself from further participation in considering the license for the region of the state in which SSR and Wynn wished to operate.

Caesars alleges not only that Crosby was biased, owing to the Lohnes connection and Crosby's obligation to recompense him for their past dealings, but that Crosby took, or required Wells and the IEB to take, specific actions intended to favor Wynn and Lohnes and to place SSR and Caesars at a disadvantage. The allegations say that Crosby urged Wynn to compete for the license and to remain an applicant at one point when Wynn was poised to withdraw in exasperation with the proceedings. Crosby allegedly caused Wells

and the IEB to hold it against Caesars that the Gansevoort organization may have had illegal dealings with Russian criminal connections, whereas Wynn was not taxed with a suspect Macau gambling connection or Lohnes's shady associate.  Wynn was allegedly favored in setting a local referendum date for its Everett application, whereas Caesars was denied adequate (and statutorily provided) preparation time for an adjudicatory hearing to contest the facts of the unfavorable recommendation proposed. The IEB report, together with informal advice that the SSR application would be doomed by Caesars' proposed participation, caused Caesars to accede to SSR's request that it withdraw from their contractual relationship in order to save any chance of success that SSR might have.

## II.

The district court addressed the procedural due process claim under the rule announced in Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 576-77 (1972), that an action for deprivation of property by state action without due process of law must include a showing that state law protects an identified property right said to have been violated.  The substantive due process claim for deprivation of property by the arbitrary exercise of government power, of course, requires a like demonstration of a property right infringed.  See Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 8 (1st Cir. 2005).  Caesars claimed property

in an implied contract with the state, promising a license applicant fair play in reaching a decision, as well as property in its contract with SSR. The district court accepted both theories, but Caesars apparently placed principal reliance on the implied contract, which was the primary subject of the court's discussion in concluding that Caesars had adequately pleaded a violation of due process. It nonetheless dismissed the official capacity claims as barred by state immunity under the Eleventh Amendment, and dismissed the individual liability claims on the ground of qualified immunity, see Maldonado v. Fontanes, 568 F.3d 263, 268-69 (1st Cir. 2009). The equal protection claims were dismissed for failure of adequate pleading that the competing entities were similarly situated, and the state cause of action was subject to discretionary dismissal for want of a federal claim supporting the exercise of supplemental jurisdiction.

III.

The first step in seeking relief from a deprivation of property without due process in violation of the Fifth and Fourteenth Amendments is a legally plausible allegation of a "protected property interest" recognized under state law. See Centro Medico, 406 F.3d at 8 (citing Roth, 408 U.S. at 577). Caesars has not made an allegation sufficient to complete that first step.

Two, and possibly three, claims of a protected property

-7-

interest have been pressed or at least indicated before us.[2]  The

district court devoted principal attention to a theory of protected

property interest for which there was then some Massachusetts

authority, to the effect that submitting a bid for a public

contract creates an implied contract giving rise to a right of

property protected against unfairness in considering the bid.  See

Paul Sardella Constr. Co. v. Braintree Hous. Auth., 329 N.E.2d 762,

767 (Mass. App. Ct. 1975), aff'd, 356 N.E.2d 249 (Mass. 1976).  For

the purpose of federal-question property analysis, this precedent

may well have suffered from circularity, but in any event while

this appeal was pending the theory's application to casino license

application was clearly repudiated by the Supreme Judicial Court of

Massachusetts in Abdow v. Att'y General, 11 N.E.3d 574, 582-88

(Mass. 2014) (holding that, because the regulation of gambling

falls within a state's core police power, neither a casino licensee

---

     [2]     We are not sure that Caesars does refer to a third
theory, though if it does any argument for it is circular.  Caesars
quotes, out of its context, an observation of the district court
that it would violate due process for state actors to conspire
deceitfully and purposely to deprive an applicant for a state-
provided license of the opportunity to compete for it.  Appellants'
Br. 29.  But in making that statement the court simply was not
enquiring into the existence of the property said to have been the
subject of deprivation.  Suffice it to say that there is no
freestanding right to due process that is itself a form of property
that the right to due process is guaranteed to protect.  See Town
of Castle Rock v. Gonzales, 545 U.S. 748, 772 (2005) (Souter, J.,
concurring) ("[I]n every instance of property recognized by this
Court as calling for federal procedural protection, the property
has been distinguishable from the procedural obligations imposed on
state officials to protect it.").

nor an applicant for a casino license possesses the type of entitlement necessary to conclude that the license or application is property under state law).  See Appellants' Br. 31 n.8 (conceding this point).

That decision has left Caesars with only its alternative theory of property, which it repeatedly states as a general rule that "[c]ontracts between private parties, as the Caesars Entities enjoyed with SSR . . .[,] give rise to a protected property interest for constitutional purposes."  Id. at 27 (citation and internal quotation marks omitted).  At this level of generality, however, the statement is too blunt to address the specific question in this case, which is whether any property interest created by a private contract like the Caesars-SSR agreement is protected property as against non-party state actors whose untoward conduct eliminates an applicant or its qualifiers from competition for a casino license.

An examination of the state cases recognizing property rights created by private contract will show why the general statement misses the narrower question pertinent here.  To be sure, contracts may be a form of property under state law. See Bos. Elevated Ry. Co. v. Commonwealth, 39 N.E.2d 87, 109 (Mass. 1942) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." (quoting Lynch v. United States, 292 U.S. 571, 579 (1934))); see

-9-

<u>also</u> 31 <u>Williston on Contracts</u> § 78:68 (4th ed.) (discussing contracts as property in the context of bankruptcy estates). The mere existence of a contract or its breach, however, is not sufficient to show a "protected property interest" for purposes of a due process claim of improper government interference. <u>See</u> <u>Redondo-Borges</u> v. <u>U.S. Dep't of Hous. & Urban Dev.</u>, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."). Rather, the critical enquiry is whether the aggrieved party to the contract has a legitimate claim of "entitlement" to the benefits of the contract that government action may not abridge. <u>See</u> <u>Allen</u> v. <u>Bd. of Assessors</u>, 439 N.E.2d 231, 233 (Mass. 1982) (quoting <u>Roth</u>, 408 U.S. at 577).

In its simplest form, this issue is approached with some frequency in suits by employees of the government itself challenging their discharge. In these cases, Massachusetts courts have consistently held that some sort of for-cause termination provision is necessary in order for a contractual benefit of continued employment to qualify as "protected property" for purposes of due process. <u>E.g.</u>, <u>In re Powers</u>, 987 N.E.2d 569, 584 (Mass. 2013); <u>German</u> v. <u>Commonwealth</u>, 574 N.E.2d 336, 339 (Mass. 1991); <u>Harris</u> v. <u>Bd. of Trs. of State Colls.</u>, 542 N.E.2d 261, 265 (Mass. 1989); <u>Knox</u> v. <u>Civil Serv. Comm'n</u>, 825 N.E.2d 101, 105

-10-

(Mass. App. Ct. 2005); Costello v. Sch. Comm., 544 N.E.2d 594, 597-98 (Mass. App. Ct. 1989); see also Clukey v. Town of Camden, 717 F.3d 52, 56-58 (1st Cir. 2013) (collecting examples of circumstances in which other public employment benefits are protected under due process). That is to say, contractual property protected as against a contracting government requires some independently imposed or agreed-upon limitation on the government's freedom to act. Thus, in suits relating to applications or renewals of state-issued permits or licenses (which may be memorialized in contracts with the state), Massachusetts courts have held that, if the state actor retains discretion to grant or withhold the permit or license, there is no protected property interest. E.g., Roslindale Motor Sales, Inc. v. Police Comm'r, 538 N.E.2d 312, 314-15 (Mass. 1989); R.V.H., Third, Inc. v. State Lottery Comm'n, 716 N.E.2d 127, 130 (Mass. App. Ct. 1999); accord KES Brockton, Inc. v. Dep't of Pub. Utils., 618 N.E.2d 1352, 1356 (Mass. 1993). In some, albeit rare, instances, even an issued license is not a protected property interest if the recipient is on notice that the license is subject to termination or restriction. E.g., Lotto v. Commonwealth, 343 N.E.2d 855, 857 (Mass. 1976); Take Five Vending, Ltd. v. Town of Provincetown, 615 N.E.2d 576, 580-81 (Mass. 1993).

These, latter, discretionary licensing cases focus the issue in this case. Of course, at this point Caesars is not claiming

-11-

property in a contract to which the state is a party, but it is claiming property in a contract (with SSR). But because its value is an expected benefit that is dependent on the response of the state to a license application, the analysis of property as expected value is therefore the same as in the licensing cases just cited.[3] See generally VMark Software, Inc. v. EMC Corp., 642 N.E.2d 587, 590 n.2 (Mass. 1994) (describing the general rule for recovery for breach of contract actions under Massachusetts law as "expectation damages," wherein "the wronged party [is] . . . placed in the same position as if the contract had been performed" (internal quotation marks omitted)). The issue, then, is whether Massachusetts law would recognize in the request for action by the Commission a source of expectable value sufficiently reliable to be protected as property. The licensing cases point to a negative answer, and the casino licensing law does the same with unmistakable emphasis.

To begin with, such an expectation seems to be in mortal tension with Abdow: if there would be no deprivation of protectable property in a casino operation by a legislative repeal of all casino licensing authority after licenses had been issued, it is difficult to imagine that the Massachusetts courts would find a

_____

[3] We are not concerned here with whatever rights Caesars and SSR may have in relation to each other, whether the license be granted or not. The only damage identified to us is understood to be the loss of valuable benefit anticipated from operating under the casino license sought.

protectable interest in any claimed expectation of obtaining such a license applied for but yet to be issued.  See 11 N.E.3d at 586.[4]

In fact, expectation of value on the part of any applicant appears untenable as a property interest under the terms of the licensing statute itself, which invests the Commission with an apparently unlimited scope for discretionary judgment, reflecting the commercial and social risks presented by casino operation, see Selectmen v. State Racing Comm'n, 86 N.E.2d 65, 70 (Mass. 1949) (observing that, while Massachusetts has legalized some forms of gambling, "because of the nature of the business," it "can be abolished at any time that the Legislature may deem proper for the safeguarding and protection of the public welfare").  The very breadth of the subjects as identified for IEB investigation speak to the degree of that discretion: "integrity, honesty, good character and reputation of the applicant," Mass. Gen. Laws ch. 23K, § 12(a)(1); "financial responsibility, character, reputation, integrity and general fitness . . . to warrant belief by the commission that the applicant will act honestly, fairly, soundly and efficiently," id. § 12(a)(7); "any . . . reason, as determined by the commission, as to why it would be injurious to the interests of the commonwealth in awarding the applicant a gaming license," id. § 12(b).

---

[4]    Abdow was concerned with the state's exercise of core police power by legislation or referendum, but its denial of a property interest was stated more broadly.

The authorized judgment inherent in these spacious mandates is at odds with judicial reviewability for the purpose of property protection, as the statute expressly confirms. "The commission shall have full discretion as to whether to issue a license. Applicants shall have no legal right or privilege to a gaming license and shall not be entitled to any further review if denied by the commission." Id. § 17(g). This language is at war with any claims by an applicant or its contracting parties to have an expectation of value subject to property protection against state discretionary action. See Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005) ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."). On the contrary, participating in an application for a casino license is accorded no status more substantial than an act of hope alone, see Abdow, 11 N.E.3d at 585 ("[T]he possibility of abolition is one of the many foreseeable risks that casinos, slots parlors, and their investors take when they choose to apply for a license and invest in a casino or slots parlor."), and "dashed hopes [alone] . . . cannot yield a constitutionally protected property interest," Redondo-Borges, 421 F.3d at 9.

In Caesars' attempt to establish something more at stake it rests heavily, not on a contract case, but on the licensing case of Kennie v. Natural Resources Department of Dennis, 889 N.E.2d 936

-14-

(Mass. 2008).  But we think <u>Kennie</u> is persuasive in illustrating the difference between a hope to get a casino license and traditional, preexisting property right giving rise to something more, even though the property is subject to reasonable regulation. That case stands for entitlement as a matter of state law to a fair administrative process on an application for a permit to construct a dock as an adjunct to waterfront property, so long as it does not infringe the rights of neighbors or public use of waterways and submerged land, but <u>Kennie</u> does not so much as suggest the recognition of some property interest to be discerned in Caesars' position.  The property interest asserted in <u>Kennie</u> was the right to make lawful improvements to the shoreline land.  <u>Id.</u> at 943 (noting the "constitutionally protected right to make improvements," though the "right is, of course, subject to some government regulation").  Here, in contrast, Caesars' claim has no analog to the property in land and no reasonable expectation of a right to engage in an extraordinary business raising serious commercial and social risks.

Since Caesars cannot allege any protected property interest at stake, the procedural and substantive due process claims have no foundation and are correctly dismissed for failure to state a claim subject to relief.  In concluding as we do, we do not forget that the Supreme Judicial Court has not given a controlling decision on just the question before us, but we think the likelihood of an

-15-

answer in Caesars' favor is too slight to justify requesting that Court for its opinion, under Mass. S.J.C. R. 1:03.

## IV.

Caesars' remaining federal claims are that the defendants violated the Fourteenth Amendment guarantee of equal protection of the laws in forcing it out by treating it differently and to its disadvantage, for the very purposes of disfavoring it and favoring Wynn for the benefit of Lohnes. The issue raised by dismissal of these claims is whether the law construing § 1983 recognizes a claim for wrongful treatment of a casino license applicant or its associate as a class-of-one plaintiff, within the principle of Vill. of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam). That case held that an arbitrary demand for a 33-foot easement instead of the 15-foot easement required of similarly situated applicants for municipal utility connections states a cognizable claim, even though the complaining property owner did not fall within any identifiable class of the disfavored, but stood as a unique victim.

Caesars complains here as a class of one. It alleges no other applicants or potential applicants who were subject to the disadvantageous treatment it claims to have suffered and no membership in a class whose differential treatment might be suspect. Id. at 565.

We think that no class-of-one cause of action can be

-16-

recognized against state actors given the remarkable breadth of discretion provided by the Massachusetts casino licensing statute. The persuasive authority here is Engquist v. Oregon Dep't of Agric., 553 U.S. 591 (2008), which limited the scope of the Olech rule. Engquist dealt with the singular treatment claim of a government employee-at-will who was forced out of her job without, as she claimed, any reasonable justification as judged by established employment criteria or practice. Engquist's specific holding distinguished government action under the "arm's-length regulation," involved in Olech from government treatment of its own employees in positions filled subject to discretionary judgment about whom to employ, where "treating seemingly similarly situated individuals differently . . . is par for the course." Id. at 604. That is, pure legal discretion in government hiring and firing, absent contractual restrictions forming terms of employment, is not itself unreasonable, making judicial review both inappropriate, see id. at 599-600, and potentially destructive of a systemically justifiable way of doing public business, id. at 607-09.

Although Engquist's specific subject was public employment, its reasoning extends beyond its particular facts, and we agree with those federal courts that have found the case applicable beyond government staffing. See, e.g., Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1273-74 (11th Cir. 2008) (applying Engquist to government contracting); Flowers v. City of

-17-

Minneapolis, 558 F.3d 794, 799-800 (8th Cir. 2009) (applying Engquist to police investigations); but see Analytical Diagnostic Labs, Inc. v. Kusel, 626 F.3d 135, 141-43 (2d Cir. 2010) (noting some tension among the federal courts on how far Engquist's reasoning extends beyond the public employment context). The scope of the Engquist rationale, we think, is expressed in the Supreme Court's explanation that public hiring for at-will employment is an example of those "forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments . . . [in which] treating like individuals differently is an accepted consequence of the discretion granted."  553 U.S. at 603.  The price of such discretion as is considered reasonable at the systemic level is thus the absence of a crucial element of Olech's class-of-one cause of action, "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed."  Id. at 602.

These quotations from the Engquist majority opinion describe the circumstances of the casino licensing scheme at issue here. Our enquiry into the property requirement in the due process discussion has already shown the breadth of discretionary Commission judgment authorized by the general terms of the required IEB investigation into an applicant's "overall reputation," which encompasses the subject matters mentioned earlier "without

-18-

limitation." Mass. Gen. Laws ch. 23K, § 12(a). The possibility of mandating or deriving a baseline against which to assess a claim of "treating seemingly similarly situated individuals differently," Engquist, 553 U.S. at 604, is in fact even further from possibility in casino licensing than in public hiring. Nor is there any room to suggest that broad discretionary judgment is somehow out of place in licensing an activity that is disclosed in this record as attracting criminal elements at home and from abroad, and raising risks of criminal abuse and threats to projected public revenue. The IEB's and Commission's responsibility could not be further from the examples of approving utility connections or the placement of private docks, and the virtually plenary discretion that defines the state activity places this case squarely within the Engquist rule limiting class-of-one redress. The equal protection counts must accordingly be dismissed.

## V.

Since the federal claims were dismissed on the pleadings, the district court properly declined to exercise supplemental jurisdiction over the remaining state law claim for tortious interference with contractual relations. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); Rodríguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).

## VI.

The judgment of the district court is affirmed.