Sanders, Janet L., J.
This action arises from a decision by the Massachusetts Gaming Commission (the Commission) to award a license to Wynn MA, LLC (Wynn) to operate a casino in Everett, Massachusetts. In so doing, the Commission chose Wynn over Mohegan Sun Massachusetts, LLC (Mohegan), which had proposed a casino in Revere. In separate but virtually identical complaints, Mohegan, together with the City of Revere and the International Brotherhood of Electrical Workers, Local 103 (IBEW-103), seek to vacate the Commission’s decision pursuant to G.L.c. 30A, §14 and G.L.c. 249, §4. Specifically, they allege that the Commission improperly favored Wynn during the license application process and failed to apply the standards for granting a gaming license enumerated in the Massachusetts Expanded Gaming Act (the Gaming Act). Plaintiffs also bring claims under G.L.c. 231A, §1 seeking a declaration that, to the extent the Gaming Act or the Commission’s regulations prohibit judicial review, the statute is unconstitutional. Finally, Louis Ciarlone, Ronald Hills, Debra A. Santa Anna, and Elaine Leto, each members of IBEW-103 (collectively, the Individuals), separately bring a claim against the Commission asserting that it violated the Open Meeting Law, G.L.c. 30A, §§18-25, while conducting the licensing proceedings.
The claims brought by Revere, IBEW-103, and the Individuals are set forth in a Second Amended Complaint filed October 16, 2014. The claims by Mohegan are asserted byway of an Intervenor’s Complaint filed on February 6, 2015. Now before the Court is a Motion to Dismiss the claims asserted in both sets of complaints pursuant to Mass.R.Civ.P. 12(b)(6) and 12(b)(1).
As to the Second Amended Complaint, this Court concludes that Revere and IBEW-103 do not have standing to bring any of their claims since they do not allege an injury within the “zone of interest” protected by the Gaming Act. As to the separate claim alleging a violation of the Open Meeting Law, the Second Amended Complaint does not contain sufficient factual allegations “to raise a right of relief above the speculative level.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007). Accordingly, the defendants’ Motion to Dismiss the Second Amended Complaint is ALLOWED.
As to the Intervenor’s Complaint brought by Mohegan, this Court concludes that Mohegan may not challenge the Commission’s licensing decision under G.L.c. 30A, §14, but can do so under G.L.c. 249, §4. Because the constitutional claim is made only if this Court were to deny any judicial review, that claim is now moot. Accordingly, the defendants’ Motion to Dismiss the Intervenor’s Complaint is ALLOWED in part and DENIED in part. This case thus survives only as a claim made by Mohegan under G.L.c. 249, §4.
BACKGROUND
The following is taken from the two complaints and other materials appropriate for judicial notice.
The Gaming Act and Its Regulations
In November 2011, the Legislature enacted the Gaming Act, codified at G.L.c. 23K, permitting casino gambling in the Commonwealth for the first time in the state’s history. The Gaming Act sets forth a comprehensive regulatory scheme that governs the issuance of gaming licenses. To implement this regulatory scheme, the Gaming Act created the Commission, which consists of five Commissioners. The Commissioners must have some expertise in criminal investigations and law enforcement, corporate finance and securities, and legal and policy issues. G.L.c. 23K, §3(a). They are also subject to strict statutory ethical standards, the state conflict of interest law (c. 268A), and an enhanced code of ethics intended to be stricter than c. 268A, G.L.c. 23K, §3(m), (u). In addition to these ethical rules, the Commission must comply with the Open Meeting Law, which mandates that all meetings of a public body be open to the public. See G.L.c. 30, §§18, 20(a).
The Gaming Act authorizes the Commission to award three licenses to operate casinos with gaming tables and slot machines (the Category 1 Licenses) in each of three regions of the Commonwealth (Regions A, B, and C). Region A includes Suffolk, Middlesex, Essex, Norfolk, and Worcester Counties. G.L.c. 23K, § 19(a). The Commission may also award one statewide license to operate a gaming establishment with only slot machines (the Category 2 License). Id. at §20(a). The decision which is the subject of this lawsuit is the award of a Category 1 license for Region A.
The Gaming Act and its regulations establish a two-phase application process for Category 1 Licenses. Id. at §12; 205 C.M.R. §110.01. The first phase, known as the “Request for Application Phase 1" (RFA-1), begins when the Commission receives a *241 Phase 1 application from each applicant that must make several disclosures. 205 C.M.R. §111.00 et seq. In this phase, an investigation is conducted by the Investigations and Enforcement Bureau (IEB), a law enforcement agency within the Commission. G.L.c. 23K, §12(a); 205 C.M.R. §115.03. The IEB submits a written report to the Commission that provides findings and recommendations on the suitability of the license applicant. Id. Following the submission of this report, the Commission holds either a public hearing or an adjudicatory proceeding. It then issues a written determination of suitability. 205 C.M.R. §115.04-05.
When evaluating suitability, the Commission must assess the overall reputation of the applicant. In making that assessment, it must consider the following factors: the applicant’s integrity, honesty, good character, and reputation; its financial stability; its business practices; its history of compliance with gaming license requirements in other jurisdictions; and the suitability of all parties in interest to the gaming license, including affiliates and close associates. G.L.c. 23K, § 12(a). The Commission must deny a gaming license application if the applicant: a) has been convicted of a felony or other crime involving embezzlement, theft, fraud or perjury; b) has submitted a false or misleading application; c) has engaged in a pattern of misconduct that makes the applicant unsuitable for a license; or d) has affiliates or close associates that would not qualify for a license or whose relationship with the applicant could be injurious to the Commonwealth’s interests. G.L.c. 23K, §16(a). These same factors apply equally to any entity or individual “with a financial interest in the business of the gaming licensee or applicant for a gaming license or who is a close associate of a gaming licensee.” G.L.c. 23K, § 14(a). If these other entities or persons with such an interest are themselves unsuitable, then the applicant is not suitable either. Id.
Only those applicants found to be suitable may proceed to the second phase, known as the “Request for Applicants Phase 2" (RFA-2). See 205 C.M.R. §110.01(2). In RFA-2, the applicant submits another application. G.L.c. 23K, §§12, 17; 205 C.M.R. §119.01. This second application is:
designed to require applicants to demonstrate that they have thought broadly and creatively about creating an innovative and unique gaming establishment that will create a synergy with, and provide a significant and lasting benefit to, the residents of the host community, the surrounding communities, the region, and the Commonwealth of Massachusetts, and will deliver an overall experience that draws both residents and tourists to the gaming establishment and Commonwealth of Massachusetts.
205 C.M.R. §119.01. To that end, the RFA-2 application focuses on the site, design, operation and other attributes of the gaming establishment, including the mitigation of adverse impacts.
Among other things, a completed RFA-2 application must contain a copy of a host community agreement as well as a certificate showing that the host community voted in favor of the license in a referendum. 205 C.M.R. §119.01(4), (7); G.L.c. 23K, §15(8), (13). Ahost community agreement sets forth the community impact fee that will be paid to the host community and the mitigation measures planned to minimize negative impacts from the development and operation of the proposed gaming establishment. G.L.c. 23K, §15(8). The RFA-2 application must also include copies of any surrounding community agreements the applicant entered into prior to submission. 205 C.M.R §119.01(8). Unlike host communities, surrounding communities are not entitled to vote for or against the casino in a referendum. They are nevertheless entitled to mitigation of the casino’s potential negative impacts as expressed in surrounding community-agreements entered into with the license applicant. G.L.c. 23K, §15(9).
The Commission is responsible for formally designating the surrounding communities of the proposed gaming establishment. G.L.c. 23K, §17(a). Those municipalities that have already entered into a surrounding community agreement with the license applicant are automatically designated as such. If a municipality-does not have such an agreement when the RFA-2 application is filed, it may petition the Commission for surrounding community status. 205 C.M.R. §125.01(2). If the Commission determines that a municipality is a surrounding community, the applicant must negotiate a signed agreement with that municipality within 30 days of the determination. G.L.c. 23K, § 17(a). If no agreement is reached by the 30-day deadline, the Commission’s regulations require the applicant and the municipality to enter into arbitration where a panel chooses between competing “best and final offers” given by the applicant and affected municipality. See 205 C.M.R. §125.01(6)(b), (c). If a municipality refuses to participate in the arbitration process, the regulations permit the Commission to deem the municipality to have waived its designation as a surrounding community. Id. at §125.01(6)(a)(2).
When considering the merits of an RFA-2 application, the Commission evaluates whether the applicant meets sixteen minimum criteria for a license and advances nineteen other objectives. G.L.c. 23K, §§15, 18. These objectives include “promoting local businesses,” “building a gaming establishment of high caliber with a variety of quality amenities,” “providing a high number of quality jobs,” and “gaining support of the host and surrounding communities.” Id. at §18(2), (5), (12), (19). The Commission is required to issue “a statement of findings” that discusses how the applicant “proposes to advance” each objective. Id. at §18. See also 205 C.M.R. §119.03. The Commission has “full discretion as to whether to issue a license.” G.L.c. 23K, §17(g). As set forth in Section 17(g), an applicant is “not... entitled to any further review if denied by the commission.”
*242 Award of the Region A Category 1 License
In January 2013, Sterling Suffolk Racecourse LLC (Sterling Suffolk) and Wynn each sought licenses for Region A and submitted competing RFA-1 applications. Wynn proposed to build a casino in Everett at the site of a former Monsanto Chemical plant, a landlocked property accessible only through a road known as Horizon Way. Part of Horizon Way passes through Boston. Sterling Suffolk proposed to build a casino on its land at the Suffolk Downs Racecourse (Suffolk Downs), which straddles Revere and East Boston. Caesars Entertainment (Caesars) planned to serve as manager, operator, and part owner of the Sterling Suffolk casino. Around that same time, Mohegan also filed an RFA-1 application in connection with its ultimately unsuccessful effort to build a casino in Palmer, a town in Region B.
On October 3,2013, the Commission determined that Mohegan was a suitable applicant. Suffolk Sterling, however, was running into problems because of Caesars’ connection to its proposal. During the RFA-1 process, the IEB issued a report recommending that the Commission find that Caesars was unsuitable on several grounds, noting among other things that a Caesars subsidiary had a licensing agreement with a hotel group with alleged ties to organized crime. The IEB’s findings prompted Caesars to withdraw its participation in the application before the Commission could rule on its suitability. In late October 2013, the Commission determined that Suffolk Sterling was a suitable applicant but specifically conditioned its finding of suitability upon Suffolk Sterling finding a suitable operator. Thereafter, Mohegan and Sterling Suffolk entered into an agreement under which Mohegan would lease a portion of the Suffolk Downs property located in Revere from Sterling Suffolk. Mohegan then became the applicant of record for the proposed casino in Revere.[1]
Like Suffolk Sterling, Wynn too faced problems with its RFA-1 Application. In December 2012, Wynn signed an Option Agreement that provided Wynn with the right to purchase the Monsanto Chemical site for $75 million. FBT Everett Really, LLC (FBT) owned the site. At the time, FBT’s owners included Paul Lohnes, Anthony Gattineri, Dustin DeNuzio, and Charles Lightbody. Lohnes is a friend and former business partner of Commission Chairman Stephen Crosby. Lightbody is a convicted felon with reputed ties to organized crime.
In the summer 2013, the IEB alerted Wynn and the Commission to its discovery that a convicted felon (i.e., Lightbody) was an owner of FBT.[2] The revelation prompted Wynn, in cooperation with the Commission, to execute an amendment to the Option Agreement. The amendment lowered the purchase price of the land to $35 million, $10 million of which was reserved for environmental clean up, to reflect the fair market value of the property without casino use. The amendment also inserted a clause in the Option Agreement requiring that Lohnes, DeNunzio, and Gattineri sign a “Confirmation of Representation” verifying that they were the sole owners of FBT and would be the only beneficiaries of the proceeds of the land sale. In mid-December 2013, the Commission held a hearing at which it determined that the amendment cured the problems raised by the IEB. Prior to that hearing, Chairman Crosby recused himself from the proceedings.
In late December, Lohnes and DeNunzio each signed the Confirmation of Representation required by the Option Agreement. These Confirmations indicated that the proceeds from the Option Agreement would flow to a consultant/lobbyist named James Russo, a long time business partner of Lightbody who was allegedly charged in the 1990s with conspiracy and larceny in connection with activities at Foxwoods Resort Casino. Although Gattineri refused to sign a Confirmation, he did sign a different document titled “Certificate” some months later containing several representations regarding his interest in FBT. The language of that certificate, however, differed materially from the Confirmation required by the amendment to the Option Agreement.
On December 27,2013, following a hearing on Wynn’s suitability, the Commission issued a favorable Phase 1 Suitability Decision regarding Wynn. Four days later, Wynn and Mohegan filed their RFA-2 applications.
In connection with the RFA-2 Application, Mohegan negotiated a host community agreement with Revere and surrounding community agreements with Boston, Som-erville, and ten other nearby cities. It also negotiated a neutrality agreement with IBEW-103, which represents 145 workers employed by Suffolk Downs. Wynn, in turn, negotiated a host agreement with Everett and entered into five surrounding community agreements with Cambridge, Malden, Medford, Somerville, and Chelsea. The agreements with Chelsea and Somerville were the result of arbitrations mandated under 205 C.M.R. §125.01(6). Wynn also entered into two “neighboring” community agreements with Lynn and Melrose.
As to the City of Boston, it insisted that it was a host community for the Monsanto Chemical site, based on the fact that Horizon Way passed through the City and provided the proposed casino with its only access. Wynn, on the other hand, took the position that Boston was a surrounding community. After a hearing, the Commission determined that Wynn was correct. Boston refused to enter into a surrounding community agreement with Wynn, however, or to participate in any arbitration. As a result, the Commission de-designated Boston as a surrounding community. 
After the RFA-2 applications were submitted, the Commission decided that it would evaluate each application based on five categories: a) General Overview, b) Financial, c) Economic Development, d) Building Site and Design, and e) Mitigation. These categories were intended to encompass each of the objectives in G.L.c. 23K, §18. The Commission then put together evaluation teams of industry experts for each category and charged them with reviewing the applications based on the cate *243 gory assigned to them. A Commissioner oversaw and was responsible for each evaluation team.
The Commission began their deliberation process on September 8, 2014. Each Commissioner presented a report based on the work of his or her evaluation team and recommended licensing conditions connected to the categoiy for which she or he was responsible. The reports and recommendations were discussed at public meetings. Following these discussions, the Commission proposed licensing conditions for each applicant and invited the applicants to prepare responses.
On September 12, Mohegan and Wynn submitted responses to the Commission’s proposed licensing conditions. Mohegan accepted nearly all of the licensing conditions recommended by the Commission. Wynn, however, refused to accept many conditions, including those relating to site design and traffic mitigation in Sullivan Square, Charlestown. At a public hearing held two days later on September 15, the Commissioners criticized Wynn’s refusal to make any further changes to its application. Following a 30-min-ute recess, the Commission decided, at the suggestion of one Commissioner, to permit each applicant 20 minutes the next day to “clarify” its responses to the Commission’s conditions. On the morning of September 16, Wynn submitted revised responses, and the Commission voted 3-1 in favor of awarding the Region a Categoiy I License to Wynn. On September 17, the Commission voted 4-0 to enter into an agreement to award the license to Wynn pursuant to its revised set of license conditions. Two months later, the Commission issued a written decision titled “Determination of Issuance of a License to Operate Categoiy 1 Gaming Establishment in Region A” explaining its reasons for awarding the license to Wynn rather than Mohegan based on the objectives detailed in G.L.c. 23K, §18.
This lawsuit was initiated on October 16, 2014. In their Second Amended Complaint, the City of Revere and IBEW-103 allege that the Commission failed to properly apply the statutoiy factors for granting agaming license. More specifically, they claim that the Commission ignored or minimized the many ways in which Mohegan’s proposal was superior to Wynn’s, and consistently gave preferential treatment to Wynn to the detriment of other applicants, including Mohegan and Caesars. In early February 2015, Mohegan filed amotion to intervene in the lawsuit, which was granted without opposition. The Intervenor’s Complaint is virtually identical to the Second Amended Complaint filed by the City of Revere and the IBEW-103, with one exception: the Second Amended Complaint also contains the count (CountV) asserted by the four Individual plaintiffs alleging that the Commission has violated the Open Meeting Law.
DISCUSSION
A. Claims Asserted by Revere and IBEW-103
The Second Amended Complaint contains four counts asserted by the City of Revere and IBEW-103. The first two counts seek judicial review of the Commission’s decision—Count I pursuant to G.L.c. 30A, §14, and Count II pursuant to G.L.c. 249, §4. Counts III and IV seek a declaratory judgment under G.L.c. 231, §1. Both of those counts challenge the constitutionality of the Gaming Act and its underlying regulations in the event this Court were to conclude that no judicial review was available. In moving to dismiss Counts I through IV, the Commission argues, among other things, that IBEW-103 and Revere have no standing to bring them. This Court agrees.
The question of standing is one of critical importance since, in its absence, this Court has no subject matter jurisdiction over the case. “From an early day, it has been an established principle in this Commonwealth that only persons who have themselves suffered or who are in danger of suffering legal harm can compel the courts to assume the difficult and delicate duly of passing upon the validify of the acts of a coordinate branch of government.” Tax Equity Alliance v. Commissioner of Revenue, 423 Mass. 708, 715 (1996), quoting Kaplan v. Bowker, 333 Mass. 455, 459 (1956). In order for a plaintiff to have standing so as to be entitled to a judicial forum, the plaintiff must allege an injury within the “zone of interests” arguably protected by the statute. “It is not enough that the plaintiffs be injured by some act or omission of the defendant; the defendant must additionally have violated some duly owed to the plaintiffs.” School Comm. of Hudson v. Board of Educ., 448 Mass. 565, 579 (2007), quoting Penal Inst Comm’r for Suffolk County v. Commissioner of Corr., 382 Mass. 527, 532 (1981) (citations omitted). Determining whether an injuiy is within the zone of interest involves an examination of “several considerations, including the language of the statute in issue; the Legislature’s intent and purpose in enacting the statute; the nature of the administrative scheme; decisions on standing; any adverse effects that might occur, if standing is recognized; and the availability of other, more definite, remedies to the plaintiffs.” Enos v. Secretary of Env’t’l. Affairs, 432 Mass. 132, 135-36 (2000).
Revere claims it has standing “within the zone of interest” of the Gaming Act because the statute seeks to protect and benefit host and surrounding communities. The City emphasizes that a key prerequisite to obtaining a license is that applicants get a binding vote from the host community approving the casino and enter into agreements with host and surrounding communities that provide impact fees and mitigation commitments. Revere, however, is neither a host community nor a surrounding community in relation to Wynn’s proposed casino and therefore faces none of the negative consequences from its operation that these measures are intended to address. When Wynn was awarded the casino license, the only harm Revere suffered was the loss of potential economic benefits it may have received had Mohegan been the winning applicant. Nothing in the statute indicates a concern for such disappointed expec *244 tations or that the Commission has some duty to the host communities of unsuccessful applicants. Revere therefore has no standing to challenge the award of the Region a license to Wynn.
IBEW-103 likewise fails to allege an injury within the Gaming Act’s zone of interest. It maintains it has standing based on the Legislature’s declaration that “the commonwealth must provide for new employment opportunities in all sectors of the economy, particularly opportunities for the unemployed, and shall preserve jobs in existing industries in the commonwealth.” G.L.c. 23K, §1(5). This general statement, however, in no way suggests that the Gaming Act created any duly by the Commission to protect the interests of unions whose employees would have benefited from the award of a license to another applicant. Indeed, if the declaration were sufficient to bring IBEW-103 into the Gaming Act’s zone of interest, virtually any resident who could have been employed by the Mohegan casino would also have standing to challenge the Commission’s award of the Region A license to Wynn. The Legislature’s expressed desire to provide employment opportunities simply cannot confer standing. Accordingly, IBEW-103 and Revere’s claims must be dismissed.
B. Claims Asserted by Mohegan
Mohegan makes precisely the same claims that Revere and the IBEW-103 do. That is, it seeks to vacate the Commission’s decision awarding the Region A license to Wynn pursuant to both G.L.c. 30A, §14 (Count I) and under G.L.c. 249, §4 (Count II). In the event that this Court were to conclude that no judicial review were available, Mohegan, like the City of Revere, also includes in its complaint two counts (Counts III and IV) challenging the constitutionality of the Gaming Act. As to Counts I and II, the Commission does not argue that Mohegan lacks standing. Instead it argues that the claims are time-barred and in any event are precluded by the plain terms of the Gaming Act, which specifically states that a denial of a license is not subject to judicial review. This Court concludes that Mohegan may pursue its claim under Count II.
Turning first to the limitations argument, this Court notes that the statute of limitations applicable to claims brought under either G.L.c. 30A or G.L.c. 249 is extraordinarily short. As to G.L.c. 30A, the claim must be brought within thirly days. A claim asserted under G.L.c. 249, §4 must be brought within sixly days. The limitations period for a certiorari claim brought under G.L.c. 249, §4 is strictly enforced: a failure to file the action within the limitations period is regarded as a “serious misstep” that requires dismissal even if the defendant fails to plead the statute of limitations as an affirmative defense. Pidge v. Superintendent Mass. Correctional Inst., Cedar Junction, 32 Mass.App.Ct. 14, 18 (1992), quoting McLellan v. Commissioner of Correction, 29 Mass.App.Ct. 933, 935 (1990). The statute of limitations begins to run from the date of the last action by the administrative agency. Id. The parties disagree as to what date that is, but even using the earlier date of September 17, 2014 proposed by the Commission, this Court concludes that Mohegan’s claims are not time barred.
The Second Amended Complaint was filed on October 16, 2014, within thirty days of September 17. Although Mohegan did not file its Complaint as an Intervener in this case until February 6, 2015, this Court agrees with Mohegan that, under the “relation back” doctrine, the relevant date for statute of limitations purposes is October 16, 2014. As the Supreme Judicial Court explained in Rafferty v. Sancta Maria Hosp., 5 Mass.App.Ct. 624, 628-29 (1977), there is no distinction for statute of limitations purposes between the addition of a new plaintiff under Rule 15 and the intervention of a new party under Rule 24: in either case, the relevant date is the date that the original complaint was filed. That is, “the joinder of a real party in interest shall have the same effect as if the action had been commenced in the name of that party.” Sargent v. Commissioner of Pub. Welfare, 383 Mass. 808, 819-20 (1981) (citing to Mass.R.Civ.P. 24(a)(2), court concluded that the intervener’s claim was not untimely). Although the Commission argues that the relation back doctrine does not apply where the new party has intervened under Rule 24, the cases it cites in support of this position are inapposite.
The Commission next argues that Mohegan cannot proceed under Count I because the Gaming Act forecloses a claim under G.L.c. 30A; it further contends that Mohegan has no claim under Count II because it cannot meet the prerequisites for certiorari review pursuant to G.L.c. 249, §4. This Court concludes that the Commission is correct as to Count I, but not as to Count II.
As to Count I, G.L.c. 30A, §14 provides a right to judicial review of an agency action “[e]xcept so far as any provision of law expressly precludes judicial review.” That is precisely what the Gaming Act does. Section 17(g) states:
The Commission shall have full discretion as to whether to issue a license. Applicants shall have no legal right or privilege to a gaming license and shall not be entitled to any further review if denied by the commission.
Seeking to avoid the implications of this language, Mohegan argues that Section 17(g) excludes judicial review only as to the denial of a license application, and that Mohegan is seeking review of the Commission’s decision to grant a license to Wynn. But there is only a single decision at issue in this case, and that decision necessarily involved a choice between competing applicants. Thus, in granting the license to Wynn, the Commission simultaneously denied Mohegan’s application. To read section 17(g) as Mohegan suggests defies common sense.
Mohegan stands on much stronger ground, however, with respect to its certiorari claim under Count II. It is well established that “certiorari lies notwithstanding provisions barring appeal by any party.” See *245 Gudanowski v. Northbridge, 17 Mass.App.Ct. 414, 417 (1984), quoting Natick v. Massachusetts Dept. of Pub. Welfare, 341 Mass. 618, 620 (1961) (emphasis in original). Where no other means of review are available, the certiorari statute permits review to correct “substantial errors of law” which adversely affect a “material right of the plaintiff.” Massachusettts Bay Transp. Auth. v. Auditor of the Commonwealth, 430 Mass. 783, 790 (2000). The Commission concedes as much, but argues that the requirements of certiorari are not met here. A viable certiorari claim lies only where the plaintiff has some “justiciable right” at stake and is challenging a decision which is the product of a “judicial or quasi-judicial proceeding.” See Indeck v. Clients’ Sec. Bd., 450 Mass. 379, 385 (2008). This Court concludes that Mohegan does satisfy these two prerequisites, notwithstanding the Commission’s arguments to contrary.
In contending that Mohegan has no justiciable rights, the Commission relies heavily on Abdow v. Attorney Gen., 468 Mass. 478 (2014) (Abdow), and Caesars Mass. Mgmt. Co., LLC v. Crosby, 778 F.3d 327 (1st Cir. 2015) (Caesars). These cases, however, stand only for the proposition that applicants for a gaming license have no constitutionally protected property interest at stake. Thus, in Abdow, the SJC held that, for purposes of whether the anti-gaming referendum could effectuate a taking, there was no property right to a gaming license nor any property right to a decision from the Commission on a license application. 468 Mass. at 490, 496. Relying on Abdow, the First Circuit held in Caesars that plaintiff had no claim against individual Commissioners under 42 U.S.C. §1983 because the plaintiff alleged no violation of a constitutionally protected right. 778 F.3d at 332-35. Neither of these decisions concerned whether a litigant like Mohegan has a “justiciable right” for purposes of certiorari review. Here, Mohegan alleges that it spent time, effort, and money in pursuit of a license and yet it was subject to a licensing process that violated the provisions of the Gaming Act. Although it cannot argue that the denial of its application was in violation of its constitutional due process rights, it does have a “justiciable right” at stake and therefore can obtain judicial review of the Commission’s decision under G.L.c. 249, §4.
Indeed, Massachusetts case law makes it clear that the absence of a property interest in a license does not bar a disappointed applicant from seeking relief in the nature of certiorari. For example, the Supreme Judicial Court has held that a decision by the Board of Registration to indefinitely suspend the plaintiffs medical license was subject to judicial review even though the plaintiff had no constitutionally protected property interest in the license itself. Hoffer v. Board of Registration in Med., 461 Mass. 451, 456-57 (2012). The SJC in Hoffer concluded that the “wrongful withholding of reinstatement to plaintiffs chosen profession” was sufficient injury to satisfy the requirement that a “justiciable right” had be at stake in order to obtain certiorari review. Similarly, in Saxon Coffee Shop, Inc. v. Boston Licensing Bd., 380 Mass. 919, 922-23 (1980), the SJC held that the injury suffered by a plaintiff who was denied a common victualler’s license was enough to give the court jurisdiction to review a decision by the Boston Licensing Board. That the plaintiffs in both Hoffer and Saxon did not have a statutory or constitutional right to a license did not preclude them from obtaining judicial review so long as the other requirements of a certiorari claim were satisfied. The same is true here.
As to the requirement that the decision at issue be the product of a judicial or quasi-judicial proceedings, the Commission contends that the RFA-2 proceedings were legislative, not quasi-judicial in nature. In general, an administrative proceeding is more likely to be considered legislative or regulatory when it: (1) involves unsworn statements by interested persons rather than sworn testimony by witnesses subject to cross examination; (2) is not preceded by specific charges; and (3) is not followed by the adoption of formal findings of fact. See School Comm. of Hudson v. Board of Educ., 448 Mass. 565, 576 (2007) (Hudson). Particularly where a proceeding is designed to elicit public comments and is conducted in a nonadversarial fashion, it is more likely to be deemed to be legislative in nature. Thus, in Hudson, the school committees of four towns who opposed an application for a charter school could not seek judicial review of the Board of Education’s decision to grant the charter to a private entity. There was no adjudication of the rights of the school committees, which were no different than other members of the public given an opportunity to comment.
Citing various provisions of the Gaming Act as well as its own regulations, the Commission asserts that the licensing determination was not adjudicatory but rather involved non-adversarial public hearings of the sort discussed in Hudson. See G.L.c. 23K, §§17(c) and 19(d); see also 205 C.M.R. §118.07(1). Unlike the Board of Education in Hudson, however, the Gaming Commission had to make a decision between two competing applicants, one of them being Mohegan. Each applicant prepared extensive submissions that advocated the merits of its application, and responded to the conclusions of the Commission’s recommendations regarding licensing conditions. Although the proceedings did not involve specific charges, the Commission’s decision concerned particular persons rather than just broad policy matters. Moreover the Commission issued a written decision in December 2014 in which it made findings of fact in connection with each application, compared the extent to which each applicant satisfied the objectives in G.L.c. 23K, §18, and explained why it decided to award the license to Wynn and not Mohegan in light of those objectives. The individualized nature of the Commission’s assessment process and the issuance of findings pursuant to G.L.c. 23K, §18 strongly suggest that the proceedings were quasi-judicial despite the public’s participation. This Court thus concludes that all *246 the perquisites for a certiorari action have been satisfied and that Mohegan may proceed under G.L.c. 249, §4.
C. Claim Asserted by the Individuals
Count V of the Second Amended Complaint is asserted only by the four Individuals and alleges a violation of the Open Meetings Law (OML). The Commission seeks to dismiss this Count on the grounds that it fails to state a claim upon which relief may be granted. This Court agrees that this Count does not satisfy the standard applicable under Rule 12(b)(6).
The OML requires that “all meetings of a public body ... be open to the public.” G.L.c. 30A, §20(a). A “meeting” consists of a “deliberation by a public body with respect to any matter within the body’s jurisdiction.” G.L.c. 30A, §18. It does not include “attendance by a quorum of a public body at a public or private gathering, including a conference or training program or a media, social or other event, so long as the members do not deliberate.” Id. A deliberation, in turn, is “an oral or written communication . . . between or among a quorum of a public body on any public business within its jurisdiction” that does not encompass “the distribution of a meeting agenda, scheduling information or distribution of other procedural meeting or the distribution of reports or documents that may be discussed at a meeting, provided that no opinion of a member is expressed.” Id.
The Second Amended Complaint alleges that the Commission violated the OML by engaging in deliberations outside public view. As to the factual allegations in support of this, the complaint states that the Commissioners “regularly would break for recesses throughout the Commission’s Region Ahearings,” and “[o]n information and belief, during these breaks more than two Commissioners would meet in private.” Second Amended Complaint at ¶¶153-54. The Individuals specifically point to the September 15, 2014 hearing where, following a 30-minute recess and at the suggestion of one Commissioner, the Commission decided to give both Mohegan and Wynn an opportunity to “clarify” their responses to the Commission’s proposed licensing conditions the next morning. The complaint then states, in conclusoiy fashion, that “[o]n information and belief’ this decision was reached after a “closed-door deliberation with other Commissioners, and/or a serial communication between a quorum of the Commission." Id. at ¶¶155-56. These allegations, however, fail “to raise a right of relief above the speculative level.” Iannacchino v. Ford Motor Co., 451 Mass. at 636, quoting Bell Atl. Corp. v. Tomboy, 550 U.S. at 555-57. The fact that the Commissioners took recesses—an innocuous activity in and of itself—does not thereby permit the inference that the Commissioners engaged in improper deliberation outside the public view.
In order to bolster their allegations, the Individuals also point to entries in the Commissioners’ calendars obtained following the filing of the complaint.[3] One set of calendar entries show meetings between two Commissioners, senior-level directors, and/or the Commission’s consultants. A second set of entries note weekly “Commissioners’ lunches” and two-hour biweekly meetings titled as “Agenda Planning,” “Staff,” or ‘Team” meetings. The Individuals argue that it can be inferred from these entries that the Commissioners intentionally sought to circumvent the OML through prohibited serial communications and also repeatedly met, as a quorum and in private, to engage in prohibited deliberations. Without more, however, these entries do not support the conclusion that communications and deliberations occurred in violation of the OML. See Law & Inform. Servs., Inc. v. City of Riviera Beach, 670 So.2d, 1014, 1016 (Fla.Dist.Ct.App. 1996) (allegations that OML violation “must have occurred” based on length of discussion in public session was “patent speculation . . . insufficient to state a cause of action”); Residents for a More Beautiful Port Washington, Inc. v. Town of N. Hempstead, 153 A.D.2d 727, 729 (N.Y.App.Div. 1989) (allegations that private meetings “must have taken place” are too speculative to state a claim).
The speculative nature of these allegations is even more apparent when one considers that the Commissioners are full time employees who manage the Commission’s staff and operations. G.L.c. 23K, §3. It is hardly surprising that the Commissioners would therefore have multiple meetings with other Commissioners and staff and enjoy weekly lunches together. The frequency of these events or that a quorum of Commissioners were present at these meetings does not support the conclusion that they were engaged in impermissible deliberations outside of the public view. Although the standard that the Court applies at this early stage in the proceedings is a fairly generous one, the Complaint must contain more than bald assertions or conclusoiy allegations. See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008). CountV falls short of satisfying the test that this Court applies under Rule 12(b)(6).
CONCLUSION AND ORDER
For the forgoing reasons:
1. The Defendants’ Motion to Dismiss Second Amended Complain of Plaintiffs City of Revere et al. is ALLOWED and it is hereby ORDERED that the Second Amended Complaint be DISMISSED.
2. The Defendants’ Motion to Dismiss Plaintiff-In-tervenor Mohegan Sun’s Complaint is ALLOWED as to Count I, but DENIED as to Count II. Counts III and IV are moot given the Court’s conclusion that judicial review is available. Accordingly, it is here by ORDERED that Counts I, III and IV be DISMISSED.

 The Complaints are less than clear as to what happened to Suffolk Sterling. What is clear is that only Wynn and Mohegan proceeded on to the next phase of the process.

 In late September, a state grand jury in Suffolk County returned eleven indictments against Gattineri, DeNunzio, and Lightbody relating to their alleged scheme to conceal *247 Lightbody’s Interest in the Monsanto Chemical Site in order to secure Wynn’s purchase of the property. Shortly thereafter, a federal grand jury in Boston returned its own indictment against them.

 Nile Individuals ask that the Court take judicial notice of these documents. The Commission does not appear to oppose this request.